## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PHILIP KOSOWSKY and GARY COTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ICAHN ENTERPRISES L.P., ICAHN ENTERPRISES HOLDINGS L.P., ICAHN ENTERPRISES G.P. INC., CARL C. ICAHN, ARIS KEKEDJIAN, DAVID WILLETTS, TED PAPAPOSTOLOU, KEITH COZZA, and SUNGHWAN CHO,<br><br>Defendants. | Case No. 1:23-cv-21773-KMM |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT .................................................... 1

II.  STATEMENTS OF FACTS ............................................................................................. 3

    A.  Defendants Created a Public Market for IEP Units While Maintaining Icahn's Control and Using IEP Units as Collateral for Icahn's Personal Debt ..................................... 3

    B.  The Dividend Inducement Scheme, Using Heightened Dividend Payments Amid False Statements, Omissions, and Manipulations, Buoys and Inflates IEP's Trading Price and Insulates Icahn ......................................................................................... 4

    C.  The Truth Begins to Emerge Amid Continuing Deception: the Hindenburg Report .......................................................................................................... 7

    D.  In the face of the truth, Defendants doubled down on the Scheme, further deceiving the market ...................................................................................................... 8

    E.  Revelations of a U.S. Attorney Investigation and Delayed Impairment Charge .......... 8

    F.  LTV De-Linkage and Resulting Immediate Dividend Cut Ends the Dividend Inducement Scheme ..................................................................................... 9

III. ARGUMENT.................................................................................................................. 10

    A.  Standard of Review.................................................................................................. 10

    B.  The CCAC Pleads a Deceptive Scheme Violating Rule 10b-5 (a) and (c)................ 11

    C.  The CCAC Adequately Pleads Defendants' False and Misleading Statements in Violation of Rule 10b-5(b)..................................................................................... 15

        1.  Defendants Must Speak the Whole Truth............................................................ 17

        2.  The Challenged Statements Are Not Protected Opinions..................................... 19

        3.  The Challenged Statements Are Not Insulated By the Safe Harbor..................... 22

        4.  The CCAC Sufficiently Pleads Speakers and Statements ................................... 23

        5.  The CCAC Sufficiently Pleads Deceptive Financial Manipulations.................... 26

        6.  The CCAC Sufficiently Pleads GAAP Violations............................................... 28

    D.  A Strong Inference of *Scienter* is Alleged ................................................................. 30

    E.  Plaintiffs Adequately Plead Loss Causation............................................................. 43

    F.  Plaintiffs Adequately Plead Control Person Liability................................................ 49

IV.  CONCLUSION ............................................................................................................ 50

i

# TABLE OF AUTHORITIES

*Ala. Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*,
    606 F.2d 602 (5th Cir. 1979) ................................................................ 12, 14, 27, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 31

*Barr v Matria Healthcare, Inc.*,
    324 F. Supp. 2d 1369 (N.D. Ga. 2004) ................................................................ 45

*Beckel v. Fagron Holding USA, LLC*,
    2019 WL 5110828 (M.D. Fla. June 24, 2019) ...................................................... 44

*Brown v. Enstar Grp., Inc.*,
    84 F.3d 393 (11th Cir. 1996) .............................................................................. 50

*Bush v. Blink Charging Co., et al., CASE NO. 20-23527-CV-WILLIAMS*,
    2023 WL 8263037 (S.D. Fla. Nov. 27, 2023) ............................................ 17, 19, 44

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................................... 44, 45

*Eastwood Enter., LLC v. Farha*,
No. 8:07-cv-1940-T-33EAJ 2009 WL 3157668 .................................................... 12, 34

*Ebix, Inc. Sec. Litig.*,
    898 F. Supp. 2d 1325 (N.D. Ga. 2012) ................................................................ 41

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) .................................................................. *passim*

*First Virginia Bankshares v. Benson*,
    559 F.2d 1307 (5th Cir. 1977) ................................................................ 18, 20, 21

*Fla. Emergency Physicians Kang & Assoc., M.D., Inc. v. United Healthcare of Fla., Inc.*,
    526 F. Supp. 3d 1282 (S.D. Fla. 2021) ................................................................ 11

*Fresno Cty. Emps. Ret. Ass'n. v. Comscore*,
    268 F. Supp. 3d 526 (S.D.N.Y 2017) .................................................................. 32

*Glob. Quest LLC V. Horizon Yachts, Inc.*,
    849 F.3d 1027-29 (11th Cir. 2017) ...................................................................... 22

*Hill v. Morehouse Med. Assoc., Inc., No. 02-14429*,
    2003 WL 22019936 (11th Cir. Aug. 15, 2003) ...................................................... 11

ii

*IBEW Local 595 Pension and Money Purchase Pension Plans, Macomb Cnty. Emp. v. ADT Corp.*,
   660 Fed. Appx. 850 (11th Cir. 2016) ....................................................................... 14

*In re Catalina Mktg. Corp. Sec. Litig., CASE NO.: 7:16-CV-222*
   (WLS), 390 F. Supp. 2d 1110 (M.D. Fla. 2005) .................................................... 22

*In re Clarus Corp. Sec. Litig.*,
   201 F. Supp. 2d 1244 (N.D. Ga. 2002) ............................................................ 32, 41

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................................... 33

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ................................................................... 33

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007) .................................................................. 32

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ............................................. 44, 22, 32

*In re Friedman's, Inc. Sec. Litig.*,
   385 F. Supp. 2d 1345 (N.D. Cal. 2005) .................................................................. 41

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
   843 F.3d 1257 (11th Cir. 2016) ............................................................................. 14

*In re Hamilton Bankcorp., Inc. Sec. Litig.*,
   194 F. Supp. 2d 1353 (S.D. Fla. 2002) ................................................................... 33

*In re Ibis Tech. Sec. Litig.*,
   422 F. Supp. 2d 294 (D. Mass. 2006) ..................................................................... 34

*In re Immucor Inc. Sec. Litig., No. 1:05-CV-2276-WSD*,
   2006 WL 3000133 (N.D. Ga. 2006) ....................................................................... 32

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   237 F. Supp. 3d 943 (N.D. Ca. 2017) ..................................................................... 34

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................... 34

*In re Paincare Holdings Sec. Litig.*,
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) .................................................. 32, 34, 38, 41

*In re Paradyne Networks, Inc. Sec. Litig.*,
   197 F. Supp. 2d 1349 (M.D. Fla. 2002) .................................................................. 11

*In re Physician Corp. of Am. Secs. Litig.*,
   50 F. Supp. 2d 1304 (S.D. Fla. 1999) ............................................................... 16, 26

iii

*In re Physician Corp. of Amer. Sec. Litig.*, No. 97-3678-CIV,
2002 WL 34477593 (S.D. Fla. July 25, 2002) ................................................................... 28, 29

*In re Premier Tech. Inc. Sec. Litig.*, No. 1:98-cv-1804-JOF,
2000 WL 33231639 (N.D. Ga. Dec. 8, 2000) ......................................................................... 30

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
387 F. Supp. 2d 1130 (D. Colo. 2005) .................................................................................. 33

*In re Sci. Atlanta, Inc. Sec. Litig.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010) ................................................................................. 33

*In re Scientific-Atlanta, Inc. Sec. Litig.*
239 F. Supp. 2d 1351 (N.D. Ga. 2002) ................................................................... 23, 29, 35, 41

*In re Spear & Jackson Sec. Litig.*,
399 F. Supp. 2d 1350 (S.D. Fla. 2005) ...................................................................... 16, 34, 40

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999)......................................................................... 34, 41

*In re U.S. Sugar Corp. Litig.*,
669 F. Supp. 2d 1301 (S.D. Fla. 2009) ................................................................................. 35

*In re Williams Sec. Litig.*,
339 F.Supp.2d 1242 (N.D. Okla. 2003) ....................................................................... 42, 43

*In re World Access, Inc. Sec. Litig.*,
119 F. Supp. 2d 1348 (N.D. Ga. 2000) ................................................................................. 41

*Inst. Inv. Grp. v. Avaya*,
564 F. 3d 242 (3rd Cir. 2009) ............................................................................................... 31

*Jackson v. Microchip Tech. Inc.*, No. CV-18-02914-PHX-JJT,
2020 WL 1170843 (D. Ariz. March 11, 2020) .................................................................... 21

*Luczak v. Nat'l Beverage Corp.*,
812 Fed. Appx. 915 (11th Cir. 2020) ......................................................................... *passim*

*Kennedy v. Tallant*,
710 F.2d 711 (11th Cir. 1983) .............................................................................................. 17

*Lickteig v. Cerberus Capital Management, L.P.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022) ........................................................................... 19, 42

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................................... 18

*MAZ Partners LP v. First Choice Healthcare Sol., Inc.*, Case No: 6:19-cv-619-Orl-40LRH,
2019 WL 5394011 *16 (M.D. Fla. Oct. 16, 2019) ...................................................... *passim*

*McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................. 39

*Metzner v. D.H. Blair & Co.*,
    689 F. Supp. 262 (S.D.N.Y. 1988) ................................................................. 12, 13

*Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc., Case No. 3:18-cv-771-J-34JRK*,
    2019 WL 1429667 (M.D. Fla. March 29, 2019) ................................................. 43

*MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) ......................................................... 45, 49, 50

*Murray v. Earthlink Holdings Corp., No. 4:18-cv-202 JM*,
    2023 WL 4295600 (E.D. Ark. June 30, 2023) ................................................. 16, 26

*Newman v. L.F. Rothschild, Unterberg, Towbin*,
    651 F. Supp. 160 (S.D.N.Y. 1986) ................................................................. 26

*Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pension Fund, et al.*,
    575 U.S. 175 (2015) ................................................................................. 19

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc., No. CV-21-01995-PHX-JJT*,
    2023 WL 1800963 (D. Ariz. Feb. 7, 2023) ................................................. 28

*Phillips v. Scientific-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) ................................................................. 31

*Pippenger v. McQuik's Oilube, Inc.*,
    854 F. Supp. 1411 (S.D. Ind. 1994) ................................................................. 33

*PSS World Med. Inc. Sec. Litig.*,
    250 F. Supp. 2d 1335 (M.D. Fla. 2002) ......................................... 16, 34, 41, 50

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................. 19

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
    111 F. Supp. 3d 1336 (S.D. Fla. 2015) ......................................... 26, 30, 34, 38

*Rudolph v. Arthur Andersen & Co.*,
    800 F.2d 1040 (11th Cir. 1986) ................................................................. 18

*S. Ferry LP #2 v. Killinger*,
    542 F.3d 776 (9th Cir 2008) ................................................................. 31, 32

*SEC v. Curshen*,
    888 F. Supp .2d 1299 (S.D. Fla. 2012) ................................................. 13, 41

*SEC v Arbitrade Ltd.*,
    668 F. Supp. 3d 1290 (S.D. Fla. 2023) ................................................................. 12

*SEC v. Gane, Case No. 03-61553-CIV-SEITZ,*
   2005 U.S. Dist. LEXIS 607 (S.D. Fla. Jan. 4, 2005) ............................................................ 34

*SEC v. Merch. Cap., LLC,*
   483 F.3d 747 (11th Cir. 2007) ............................................................................................ 17

*SEC v. Sugilight, Inc., Case No. 6-02-CV-431-Orl-18KRS,*
   2002 U.S. Dist. LEXIS 22853 (M.D. Fla. Oct. 15, 2002) .................................................. 41

*Sec. and Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.,*
   375 U.S. 180, n.41 (1963) .................................................................................................... 2

*Teco Energy Inc., Sec. Litig.,*
   2006 WL 845161 (M.D. Fla. Mar. 30, 2006) ...................................................................... 45

*Tellabs v. Makor Issues & Rights, LTD., et al,*
   551 U.S. 308 (2007) ...................................................................................................... 31, 34

*Exchange Act. Mizzaro V. Home Depot, Inc.,*
   544 F.3d 1230 (11th Cir. 2018) .......................................................................................... 50

*Theodore v. Purecycle Technologies,*
   2023 WL 4035880 (M.D. Fla. 2023) ............................................................................ 33, 34

*Underwood v Lampert, CASE NO.*
   02-21154-CIV-ALTONAGA/ Bandstra, 2004 WL 7332754 *15 (S.D. Fla. Aug. 30, 2004)  42

*Wood v. Cincinnati Safe & Lock Co.,*
   96 Ga. 120, 22 S.E. 909 (1895) ............................................................................................ 2

*Worthy v. Phenix City,*
   930 F.3d 1206 (11th Cir. 2019) .......................................................................................... 10

*Zerman v. Ball,*
   735 F.2d 15 (2d Cir. 1984) ................................................................................................. 26

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 78j ........................................................................................................................ 10

15 U.S.C. § 78t ........................................................................................................................ 50

15 U.S.C. § 78u ..................................................................................................................15, 22

17 C.F.R. § 240.10b–5 ...................................................................................................... 11, 12

Federal Rules of Civil Procedure

Rule 7.1 .................................................................................................................................... 52

Rule 9 ............................................................................................................................. 11, 30

Rule 10 ............................................................................................................................. *passim*

Rule 12 ............................................................................................................................. 10

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' complaint (the "CCAC") alleges a sophisticated and deceptive top-down scheme (the "Dividend Inducement Scheme" or "Scheme"), by Defendants designed to buoy the trading price of IEP depositary units ("units"), including units priced at more than $1.7 billion in at-the-market offerings at inflated market prices, generating cash infusions to pay the dividends supporting the Scheme, during the Class Period of August 2, 2018 through August 3, 2023.[1] Based on Defendants' actions, in addition to false and misleading statements and omissions that violated Sections 10(b) of the Exchange Act, the Scheme was undertaken to protect IEP's founder, chairman, and controlling shareholder, Carl C. Icahn ("Icahn") from a potentially devastating margin call of an undisclosed $3.7 billion in personal margin loans arising from the violation of actively concealed loan-to-value ("LTV") ratio debt covenants and a consequent loss of control of IEP, the enterprise he founded and controlled.

Defendants carried out the Scheme by: (1) maintaining, over sixteen quarters, unsustainable quarterly dividends in the face of inconsistent financial results; (2) issuing at-the-market units to Class Period investors to secure more than $1.7 billion in cash infusions to fund distributions; and (3) concealing that Icahn's LTV ratios on his margin loans were linked to IEP's unit price. In addition, Defendants (a) issued false and misleading statements and omissions concealing the true basis for, and risk associated with, the dividends; (b) undertook a deliberate and ongoing lack of transparency, even amid analyst criticism; (c) concealed the amount of Icahn's $3.7 billion in margin loan debt, with LTV linkage to IEP's trading price; (d) issued skewed and misleading asset valuations to portray IEP as stronger than it was, including increasing the stated 2021 valuation of IEP's automotive division by $1 billion; and (e) delayed recognition of an

---

[1]      Unless stated otherwise, capitalized terms are defined in the CCAC.

1

impairment charge of $226 million in IEP's automotive segment until after IEP completed its at-the-market unit offering. Defendants' Scheme and false and misleading statements and omissions, succeeded in creating a false impression confounding the market. Mirroring this, Jefferies – an experienced analyst firm – was led to believe that the heightened $2 dividend was constant "in perpetuity" even under worst case scenario modeling.[2]

The Dividend Inducement Scheme was ultimately revealed through a series of public disclosures. On May 2, 2024, the Hindenburg Report reported the lack of "transparency" regarding the amount and terms of Icahn's margin loans and disclosed for the first time that IEP's asset valuations were materially inflated and its $2 per unit dividends were unsustainable. On May 4, 2023, and on May 10, 2023, IEP issued statements to re-inflate unit prices, falsely denying the findings of the Report, and doubled down on the Scheme, announcing another $2 quarterly dividend, even while revealing that the U.S. Attorney's Office for the Southern District of New York had commenced an inquiry into IEP. Finally, on August 3, 2023, immediately after Icahn delinked his $3.7 billion margin debt covenant LTV ratios from IEP's unit price ("LTV de-linkage") and in the wake of the government's investigation, IEP cut the dividend 50%, to $1, the lowest it had been in more than a decade, causing IEP's trading price to tumble.

Plaintiffs plead the "who, what, when, and where" as to Defendants' actions, omissions, and statements, and demonstrate that Defendants – especially Icahn – either knew of, or were severely reckless with regard to, the Dividend Inducement Scheme and its machinations and

---

[2] Defendants' Scheme demonstrates that "fraud is infinite," subject only to "the fertility of man's invention [to] contrive." *Sec. and Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, n.41 (1963); *see also Wood v. Cincinnati Safe & Lock Co.*, 96 Ga. 120, 22 S.E. 909, 910 (1895). ("Fraud is exceedingly subtle in its nature. There are infinite means by which it can be accomplished. ... It may be perpetrated by signs and tricks, and even silence may in some instances amount to fraud").

concealments and their false statements. Defendant's derisive catchwords such as "puzzle pleading," along with attempts to recast or ignore the import of Plaintiffs' case, are without merit when the substance of the allegations of the CCAC are considered holistically. Additionally, their effort to defeat the allegations of Scheme by inappropriately raising their own self-serving "factual" contentions outside the CCAC to explain why they cut the quarterly dividend ending the Class Period – which explanation is also false and deceptive – merits denying the Motion to Dismiss (ECF No. 97, the "MTD") so that the truth can be tested through the crucible of discovery.

II.     STATEMENTS OF FACTS

A.      **Defendants Created a Public Market for IEP Units While Maintaining Icahn's Control and Using IEP Units as Collateral for Icahn's Personal Debt**

Throughout the Class Period, Icahn and his affiliates held approximately 85% of IEP's depositary units. ¶ 3.[3] As chairman of the IEP board of directors, Icahn ruled the Company as he saw fit. ¶ 51; *see also* ¶¶ 53-55, 62. IEP was a "dividend stock" and the amount of dividends paid to IEP's minority investors, many of whom were retirees supplementing their income, was critical to the pricing of IEP units. ¶¶ 63-64. During the Class Period, IEP sold at-the-market units valued in excess of $1.7 billion at prices artificially inflated by the Scheme. The resulting cash infusion paid to unitholders funded the Scheme, as discussed below. ¶ 400.

Unbeknown to the market, Icahn amassed undisclosed personal margin loan indebtedness of approximately **$3.7 billion,** using his IEP units as collateral. Icahn's lenders imposed debt covenants setting LTV ratios linked to unit trading price, exposing Icahn to the risk of devastating margin calls. These **LTV terms, linkage to trading price, and the amount of Icahn's margin loans, totaling $3.7 billion, were concealed from investors until July 10, 2023**, even while this

---

[3]      "¶" references are to the CCAC.

massive debt placed Icahn at great personal financial risk, including risk of losing control of IEP in the event that a unit price decline triggered a margin call. ¶ 68. This LTV linkage respecting Icahn's personal margin loan debt exposure was the catalyst for the Dividend Inducement Scheme. ¶277. Meanwhile, an existing, undisclosed risk through the Class Period was de-linkage of LTV ratios from IEP's trading price ("LTV de-linkage"), as it would end the Scheme of using heightened dividends to buoy IEP's trading price, and thereby result in a cut to the dividend. ¶¶ 5, 285-294(a).

> **B.     The Dividend Inducement Scheme, Using Heightened Dividend Payments Amid False Statements, Omissions, and Manipulations, Buoys and Inflates IEP's Trading Price and Insulates Icahn**

On March 1, 2018, IEP announced a dividend increase to $1.75 per unit, boosting IEP's trading price from $54.58 on February 28, 2018, to $56.42 on March 1, 2018, increasing to $60.05 on March 5, 2018, and then to $62.05 on March 8, 2018. ¶¶ 4, 60. According to IEP's annual Form 10-Ks, the dividends were based on the following factors: "balance sheet and cash flow, the ratio of current assets to current liabilities, our expected capital and liquidity requirements, the provisions of our partnership agreement and provisions in our financing arrangements governing distributions, including the indentures governing the senior notes. . .." ¶ 67. This was untrue, given that the real basis was to buoy IEP's trading price and avoid a massive margin call. On August 2, 2018, the Icahn controlled IEP board he chaired repeated this dividend of $1.75 per unit, despite inconsistent sequential financial metrics of performance ¶¶ 5, 69. IEP's unit price reached as high as $80.32 at the close of trading on August 8, 2018. ¶ 5. But it declined again, putting more pressure to advance the Dividend Inducement Scheme to continue to buoy and inflate IEP's trading price, ¶¶ 7, 61.

4

Amid inconsistent financial performance, the Dividend Inducement Scheme accelerated with the February 28, 2019, announcement of a dividend hike from $1.75 to $2.00 per unit. ¶56, 406. The hike inflated IEP's trading price again, from $70.39 on February 26, 2019, to $72.00 on February 27, 2019, and $74.29 on February 28, 2019. ¶ 407. IEP's press release that day exclaimed: "Icahn Enterprises has a long history of endeavoring to return capital to its unitholders by delivering and paying **significant and consistent annual distributions**."[4] ¶¶ 9, 86. This furthered the impression of a consistent and sustainable quarterly distribution, determined based on the factors identified in IEP's Form 10-Ks. The repeated grant of heightened dividends buoyed or inflated IEP trading prices above what they would have traded at had the Scheme not been deployed. ¶¶ 9, 86. Meanwhile, none of the Defendants were transparent. ¶¶ 92(a)-(b), 92(d), 403-414. This ongoing lack of transparency caused major analyst UBS to withdraw coverage in January 2020. ¶¶8, 250(s).

IEP's trading price dipped below $30 per unit by March 2020, during COVID (¶ 33). On March 4, 2020, pursuing the Scheme, Icahn and his Board again granted a $2 per unit quarterly dividend, while concealing the amount of Icahn's $3.7 billion debt and the LTV ratio unit price linkage. ¶¶ 92 (a)-(b), (d); 135 (a)-(b), (d); 136-138; 165 (a)-(b), (d).

Throughout the Class Period, investors purchasing IEP's units, believing they were doing so at a fair price, were kept in the dark regarding, *inter alia*, the Dividend Inducement Scheme and the "Damocles Sword" of LTV de-linkage hanging over them. ¶ 295. LTV de-linkage constituted a material risk, since avoiding a massive margin call arising from such LTV linkage was the true basis for the continuous $2 dividends, not the factors represented in IEP's 10-K's. Even as **Form 10-Ks** were filed **year after year**, representing their factors and bases, in truth the dividend amounts

---

[4]       Emphasis added throughout unless noted otherwise.

set by Defendants were not based on financial performance metrics or liquidity as represented, but on concealed LTV ratio linkage covenants in Icahn's $3.7 billion loans and insulating him from a margin call on his massive *personal* debt.

During IEP's Second Quarter 2021 Conference Call on August 6, 2021, Kekedjian and Willetts were asked "how the dividend is funded through time? And how do you want us to think about dividend sustainability…. [g]ive us a sense of how you want us to think about that." Kekedjian responded:

> . . . **funding the dividend is not necessarily an issue for us whatsoever**. We do like our current capital allocation policy… we **just approved a $2 dividend** for the quarter, which has been **consistent with relatively past practices**. And I think **we intend on continuing that**, at least at this point in time, unless things change.

¶ 184. Another analyst noted "people are starting to say that Carl Icahn is getting on and look at that dividend. I mean what do you have to say about that dividend when the stock is trading at $58 and paying an $8 dividend? There aren't too many companies doing something like that." Kekedjian responded, "*[w]e definitely have a high dividend yield and that's one of the factors that makes the stock attractive*. So I think you're highlighting that fact." ¶ 184. This exchange failed to apprise investors of (a) the Scheme; (b) the $3.7 billion margin loan with LTV ratios linked to IEP's trading price; and (c) the risk of LTV de-linkage. ¶ 210 (a)-(b) and (d).

During IEP's Third Quarter 2021 Conference Call on November 2, 2021, CEO Kekedjian highlighted the consistent dividend, stating "[w]e have the capital flexibility to maximize the activist strategy. This track record has allowed IEP to pay 66 consecutive distributions to its unitholders … while *increasing the distribution over time*." ¶ 186. This discussion was coupled with INAV manipulations that added $1 billion to the stated INAV of the Auto Segment, even while COVID adversely impacted the world economy. ¶ 227. On November 1, 2021, the IEP Board declared a $2 quarterly distribution[.]" ¶ 186.

6

The Dividend Inducement Scheme created an ongoing false picture and impression in the market, demonstrated, for example, by a November 9, 2021, report by **analyst firm Jefferies** noting an assumed "[**c]onstant dividend of $8.00/share into perpetuity**," ¶ 65. Jefferies reiterated this as late as February 28, 2023, further illustrating how the market was misled by the Dividend Inducement Scheme to believe that IEP's significant dividends were safe. ¶¶ 65-66, 85 196- 197, 410. IEP continued $2 dividend grants through Q1 2023. ¶261, even after the May 2, 2023, Hindenburg Report disclosing that such a heightened dividend grant was "unsustainable" (¶ 250(f) - (i), 267-268), as discussed below.

C.     **The Truth Begins to Emerge Amid Continuing Deception: the Hindenburg Report**

On May 2, 2023, the Hindenburg Report started the process of unveiling the truth, partially correcting the artificial inflation embedded in IEP's unit price tainted by the Dividend Inducement Scheme. The Hindenburg Report noted and touched on numerous factual truths previously concealed, misrepresented, or camouflaged by Defendants regarding IEP's false valuation of specified assets (discussed *infra*, at §§ III. C. 1, 2) and the concealed Scheme, while informing investors that the $2 quarterly dividend was being funded by at-the-market offerings and was unsustainable. ¶¶ 250-52. The Hindenburg Report disclosed that "**Icahn has not disclosed basic metrics around his margin loans** like loan-to-value (LTV), maintenance thresholds, principle amount, or interest rates" adding "[w]e think *unitholders deserve this information in order to understand the risk of margin calls should IEP unit [trading] prices revert toward NAV,* a reality we see as inevitable," reporting that IEP "will eventually cut" its dividend. ¶¶ 250-252.

The Hindenburg Report's disclosure of this new information triggered a $10.06 per unit drop in IEP's unit price, closing at $40.36 per share on May 2, 2023 (¶ 254) and continuing to

decline to as low as $30.09 per unit by May 4, 2023 – a 40% decline, approximately $7.5 billion in value. ¶258. IEP delayed its Q1 '23 quarterly conference call to May 10, 2023. ¶ 258.

**D.     In the face of the truth, Defendants doubled down on the Scheme, further deceiving the market**

In a May 4, 2023, Press Release, IEP and Icahn deceptively chose to "reassure our long-term unitholders" that the Report "does not affect IEP's liquidity" and doubled down on the Scheme by "declar[ing] a distribution in the amount of $2.00 per depositary unit for the quarter ended March 31, 2023…." ¶ 259. Icahn claimed "[t]he fundamentals of our business … remain unchanged. **[W]e obviously disagree with the** inflammatory **assertions in the Hindenburg Report** and intend to … vigorously defend IEP and its unitholders." The Company "**encouraged**" **all investors to review IEP's SEC filings** "to receive **accurate information** about the Company." ¶¶ 259-260. This doubling down caused IEP's unit price to climb from $30.09 on May 4, 2023, to close at $38.13 on May 5, 2023. ¶ 260. IEP further disclosed that IEH Auto Parts Holding LLC had filed for bankruptcy in January 2023, noting estimated liabilities between $100 million and $500 million (¶¶ 236, 243), CEO Willetts acknowledged that "frankly, there are other items that we had to recognize that *should have been recognized perhaps a little bit more promptly* than they have been between Q4, and Q1, 2 and 3." ¶ 247.

**E.     Revelations of a U.S. Attorney Investigation and Delayed Impairment Charge**

On May 10, 2023, IEP filed its First Quarter 2023 Form 10-Q, disclosing that the U.S. Attorney's Office for the Southern District of New York had "contacted" IEP "seeking production of information" regarding, *inter alia*, its valuation practices and dividend. With the U.S. Attorney's office now involved and having completed IEP's unit offering infusing new cash from investors, IEP finally disclosed a $226 million charge related to Auto Plus – which Hindenburg had identified

as over-valued. ¶¶ 263-264. The news sent IEP unit prices spiraling again, falling $5.75 per unit, or 15.1% to close at $32.22 on May 10, 2023. ¶ 266.

Unbowed, Icahn and the Board he chaired and controlled, issued a press release on May 10, 2023, titled "**Icahn Enterprises Responds to Self-Serving Short Seller Report**," seeking to blunt the impact of the Report and the government's inquiry, emphasizing its claimed "strong balance sheet, with $1.9 billion of cash and $4 billion of additional liquidity," noting that "[t]he good news for IEP's investors is that we have Carl, the liquidity, the strategy and the know-how to fight back." The press release villainized the Hindenburg Report, accusing it of "misleading and self-serving claims." ¶ 268. This retort and denial, and follow-on conference call that same day, still concealed the amount of, and looming risk associated with, Icahn's personal $3.7 billion margin loan and its LTV ratios. **The Dividend Inducement Scheme** was **still deployed**, furthered by the **announcement of a $2 per unit quarterly dividend** for the **first quarter of 2023**. ¶¶ 269-275.

F.     **LTV De-Linkage and Resulting Immediate Dividend Cut Ends the Dividend Inducement Scheme**

On July 10, 2023, IEP disclosed that Icahn had restructured the LTV ratios of his personal margin loans, which were, for the first time, disclosed to be a massive $3.7 billion. ¶¶ 279-280. Faced with a devastating margin call scenario that could risk the loss of his control of IEP, Icahn and his personal lenders **removed the link between** his **obligation to post collateral and** his holding **Company's share price**. ¶ 280. Reuters disclosed that Icahn's collateral requirement was now tied to IEP's INAV rather than its unit price. ¶¶ 279-281.

Then, despite financial performance metrics and liquidity falling in a range that supported the prior $2 dividend practice (¶ 32), on August 3, 2023, Icahn and IEP immediately cut the dividend to $1.00 for Q2'23, the **lowest amount since February 10, 2013**. ¶¶ 289, 292. With his

9

empire under the U.S. Attorney's microscope, LTV de-linkage allowed Icahn to end his charade. ¶ 291. On this news, the trading price of IEP's unit plunged from $32.68 per unit on August 3, 2023, before the announcement, to $25.09 on August 4, 2023, and continued to decline to $16.42 per unit by November 21, 2023, removing the artificial inflation embedded in the trading price of IEP's units due to the Defendants' misconduct. ¶292. IEP's unit price chart (¶ 33) demonstrates that IEP's trading price was buoyed and inflated by the Dividend Inducement Scheme until the partially corrective disclosures of May 2, 2023, May 10, 2023, and the corrective disclosure of August 3, 2023.

## III.   ARGUMENT

### A.   Standard of Review

"When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. Section 10(b) makes it unlawful to use, "in connection with the purchase or sale" of securities, "any manipulative or deceptive device…." 15 U.S.C. § 78j(b) (2012). Rule 10b–5 provides that it is unlawful to (a) "employ any device, scheme, or artifice to defraud," or (b) to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (c) to undertake "a fraud or deceit . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (2012).

Alleging fraud under Rule 9(b) of the Federal Rules of Civil Procedure requires specificity. With regard to false statements and omissions, Rule 9(b) requires pleading (1) what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat*, 658 F.3d at 1296. However, the Eleventh Circuit recognizes this pleading standard may be applied less stringently when specific factual information is peculiarly within defendant's knowledge or control (*Hill v. Morehouse Med. Assoc., Inc.*, No. 02-14429, 2003 WL 22019936, at (11th Cir. Aug. 15, 2003)), or "for allegations of prolonged, multi-act schemes." *Fla. Emergency Physicians Kang & Assoc., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1295 (S.D. Fla. 2021). While Icahn's firm grip and control of the corporate Defendants and their exclusive knowledge of the deceptive, prolonged Scheme and internal documentation, merits such relaxation, Plaintiffs adequately plead the "who, what, when, where, and how" of the alleged fraud. See *In re Paradyne Networks, Inc. Sec. Litig.*, 197 F. Supp. 2d 1349, 1353 (M.D. Fla. 2002).

**B. The CCAC Pleads a Deceptive Scheme Violating Rule 10b-5 (a) and (c)**

The deceptive conduct challenged by the Plaintiffs' Scheme allegations includes: (1) raising dividends to $1.75, then $2, and maintaining unsustainable heightened dividends despite inconsistent liquidity and financial metrics in order to inflate IEP trading prices (¶ 32); (2) concealing the LTV linkage to unit price of Icahn's margin loans in the undisclosed amount of $3.7 billion (¶ 68); (3) using heightened dividends to buoy IEP's trading price enough to shelter Icahn from a margin call that would threaten his control of IEP (¶ 69); (4) issuing at-the-market public offerings securing more than $1.7 billion to fund the cash dividend distributions, effectively

11

"pumping" the unit prices and "dumping" inflated units on investors (¶ 400); (5) manipulating asset valuations (¶¶ 295-317); and (5) delaying a $226 million charge for Auto Plus until after completion of the last offering (¶ 248).

Plaintiffs assert "scheme liability" under 17 CFR § 240.10b-5(a), for "employ[ing] any device, scheme, or artifice to defraud," and section 240.10b-5(c), for undertaking an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." A cause of action under Rule 10b-5 scheme liability arises where, as here, "the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Ala. Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 608 (5th Cir. 1979) (*citing Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473-74 (1977)). Scheme allegations are reviewed in their context, along with the other allegations, taken as a whole. *Eastwood Enter., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668 at *3 (M.D. Fla. Sept. 28, 2009) ("[t]aken as a whole, the Complaint adequately alleges the Defendants' fraudulent schemes ..."). Plaintiffs' complaint sufficiently pleads a "scheme" to defraud investors. *SEC v Arbitrade Ltd.*, 668 F. Supp. 3d 1290, 1303 (S.D. Fla. 2023).

*Metzner v. D.H. Blair & Co*., 689 F. Supp. 262, 264 (S.D.N.Y. 1988), is illustrative. There, plaintiffs alleged defendants "create[d] a false or misleading appearance with respect to the market for certain securities . . . for the purpose of inducing the purchase and sale of securities by others[.]" The court held that defendants were "duty [bound] to disclose market manipulation" noting that "market manipulation is a fact 'reasonable investor[s] might have considered ... important in the making of th[eir] decision[s].'" *Id., citing Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153-54 (1972). There is no question that the Scheme was deceptive. In *Affiliated Ute*, the Court explained that "defendants devised a plan and induced . . .[shareholders]. . . to

12

dispose of their shares without disclosing . . . material facts that reasonably could have been expected to influence their decisions to sell." *Id*. at 153. The Court elaborated: "Under the circumstances . . . involving primarily a failure to disclose...[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id*., 406 U.S.at 153-54.

In *MAZ Partners LP v. First Choice Healthcare Sol., Inc*., Case No: 6:19-cv-619-Orl-40LRH, 2019 WL 5394011 *16 (M.D. Fla. Oct. 16, 2019)*, involving an alleged "pump and dump scheme," the court refused to hold "at this early stage of the litigation, that Defendants' omissions regarding the alleged stock manipulation scheme would be so plainly unimportant to a reasonable investor that reasonable minds could not differ[,]" noting the question is for "the trier of fact" and "usually not appropriate at the motion to dismiss stage" and recognizing "that several courts have found substantially similar omissions material." *Id*. at *8, *9 (collecting cases).[5]

*S.E.C. v. Curshen*, 888 F. Supp. 2d 1299 (S.D. Fla. 2012) ("*Curshen*"), involved a "pump and dump" scheme in which the court granted the SEC's summary judgment motion, explaining that "[t]he language of ... Rule 10b–5(a) and (c) … is 'aimed at broader fraudulent schemes' than ... Rule 10b–5(b)." *Id*., 888 F. Supp. 2d at 1307. Here, similar to the "pump and dump" schemes in *MAZ Partners* and *Curshen*, IEP's dividend was the instrument of the "pump" to inflate unit prices. The "dump" was IEP selling millions of units at inflated prices for proceeds exceeding $1.7 billion to secure cash distributions to fund and continue the Dividend Inducement Scheme. *See, e.g.,* ¶400. The Dividend Inducement Scheme, concealed from the market, adversely impacted the market, and deceived Class Period investors. As the Eleventh Circuit explains in *SEC v. Curshen*, "[a] pump-and-dump stock scheme is a ***classic violation*** of these provisions." 888 F. Supp. 2d at 1307.

---

[5] Citations and quotations omitted throughout unless otherwise noted.

Defendants, principally relying on the decisions in *IBEW Local 595 Pension and Money Purchase Pension Plans, Macomb Cnty. Emp. v. ADT Corp.*, 660 Fed. Appx. 850 (11th Cir. 2016), and *In re Galectin Therapeutics, Inc. Sec. Litig*., 843 F.3d 1257 (11th Cir. 2016), contend that there is no factual basis for holding them responsible for the Dividend Inducement Scheme. MTD at 49. In *Galectin*, defendants allegedly concealed payments to stock promoters to publish articles about an offering in advance of the company's IPO. *Id.* at 1274-75. *Galectin* is inapposite to Plaintiffs' Scheme allegations (and does not protect Defendants from Plaintiffs' misstatement and omission claims, discussed *infra*). In *Galectin*, there was "no allegation" that the Forms 10-K and 10-Q containing company's "financial figures were inaccurate." *Id*. Here, *inter alia*, Defendants' used non-GAAP figures in the form of INAVs to manipulate asset valuations and convince investors that IEP could sustain its dividend payment on ordinary operations, which it could not. ¶¶ 295-317; ¶302, ¶308. Additionally, a $226 million impairment charge was improperly delayed in order to complete the issuance of an at-the-market offering to members of the class. ¶ 248. *Galectin* is therefore inapposite.

In *IBEW*, the Eleventh Circuit analyzed the decision in *Alabama Farm,* explaining that scheme liability attaches to deceptive conduct under the federal securities laws where it "altered the market for the shares in a misleading manner" *Id*., 660 Fed. Appx. at 859. Unlike the plaintiff in *IBEW*, Plaintiffs herein plead the Scheme "unduly affect[ed] the market" for the securities at issue. *Id*. (the scheme itself was deceptive). Plaintiffs allege conduct that "can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Alabama Farm*, 606 F.2d at 608. Plaintiffs clearly allege that Icahn and the Individual Defendants engaged in the Scheme to buoy or inflate the trading price of IEP units, impacting the market for IEP securities. *See* ¶¶ 6-13, 15, 19-23, 27, 29-31, 33, 86, 426. Hence, Plaintiffs' Scheme claims should be sustained.

14

    **C.**      **The CCAC Adequately Pleads Defendants' False and Misleading Statements in Violation of Rule 10b-5(b)**

As a parallel course of conduct to the Dividend Inducement Scheme, the CCAC pleads an untrue statement and omission claim in violation of Section 10-b and Rule 10b-5(b). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). Contrary to Defendants' contentions, Plaintiffs have done so. Far from a "puzzle pleading," the CCAC pleads falsity through specific misstatements and omissions.

Plaintiffs allege that the Class Period disclosures by Defendants were untrue because they: (a) concealed Defendants' ***Dividend Inducement Scheme***; (b) concealed the amount of Icahn's $3.7 billion margin loans and concealed that the LTV ratio covenants of said loans were tethered to IEP's trading price, which was ***material to investors, especially since a margin call*** on Icahn's personal loans would threaten his control of IEP; (c) repeatedly misstated the basis used for setting the heightened dividend amount, concealing the fact that avoiding a margin call arising from LTV linkage was the true basis for setting consistently high dividends; (d) ***reported substantially inflated INAVs***, due to a combination of overly aggressive marks on IEP's investments and continued year to date underperformance in operating assets; and (e) concealed and failed to disclose the material risk of LTV de-linkage from IEP's trading price that would ***adversely impact the Company's distribution of dividends***. ¶¶ 92, 135, 165. Statements relating to fiscal year 2022 made by IEP and Icahn, Willetts, and Papapostolou were also untrue because: (1) IEP failed to disclose the series of qualitative factors, present at least by no later than the fourth quarter of 2022, which ***required IEP to perform an impairment analysis of the Automotive Parts segment*** (¶¶

15

249) and (2) ***the values IEP reported for its Automotive segment were misleading*** because of the above factors. ¶ 249. The CCAC alleges the falsity of valuations and unsustainable dividends disclosed by the Hindenburg Report, amid an ongoing lack of transparency and false denials by Icahn, IEP, and Willetts. ¶¶ 250-53, 259-260. Plaintiffs have specified the "who, what, when, where, and how" establishing the false or misleading nature of each of Defendants' specific statements. *In re Physician Corp. of Amer. Sec. Litig.,* 50 F. Supp. 2d 1304, 1317 (S.D. Fla. 1999) ("Plaintiff has specified the statements alleged to have been misleading and the reasons why such statements are misleading.").

Murray v. Earthlink Holdings Corp.*, No. 4:18-cv-202 JM, 2023 WL 4295600, *2 (E.D. Ark. June 30, 2023), is persuasive. There, defendants asserted that a "merger would provide support for the continued payment of the $.60 per share annual dividends." The company went bankrupt and plaintiffs alleged a failure to use "fair market value" in its valuations and misrepresenting a transaction that was really "disguised financing," resulting in disclosures using "misleading half-truths and material omissions regarding … sustainability of the dividend." *Id.,* 2023 WL 4295600, *5. The court sustained plaintiffs' claims "in light of the omissions alleged." *Id. Accord In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1356-57 (S.D. Fla. 2005) (complaint "identifies specific statements in specific documents attributable" to defendants, "discusses how the statements were misleading" and that "the misstatements kept S&J's stock price artificially high"); *In re: PSS World Med. Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1349-50 (M.D. Fla. 2002) (PSLRA satisfied because complaint "specifies the allegedly misleading statements and why . . . they were misleading"). In addition, Plaintiffs plead deceptive financial manipulations (¶¶ 302, 308), including an improperly delayed $226 million impairment charge (¶ 352) and the delayed Auto Plus bankruptcy (¶ 236), using an INAV for the Auto Segment that was

16

inflated by 45% ($1 billion) (¶ 315), and issuing untrue SOX certifications signed by specific Defendants (¶¶ 357-63), to disguise the Scheme for as long as possible and create a false impression supporting the issuance of at-the-market offerings of inflated IEP units to investors and using such cash infusions to fund the Scheme while allowing Icahn to significantly increase his unit holdings (¶ 315, 400). These allegations satisfy the PSLRA.

### 1.   Defendants Must Speak the Whole Truth

The Exchange Act prohibits "omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Bush v. Blink Charging Co., et al.*, CASE NO. 20-23527-CV-WILLIAMS, 2023 WL 8263037 at *5 (S.D. Fla. Nov. 27, 2023) (*citing FindWhat*, 658 F.3d at 1305 (*quoting* 17 C.F.R. § 240.10b–5(b))). "[V]oluntarily revealing one fact" creates a duty "to disclose such other facts . . . as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat*, 658 F.3d at 1305-06 ("assumes a duty to speak fully and truthfully on those subjects"); *accord Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983) ("Full and fair disclosure cannot be achieved through piecemeal release of subsidiary facts"). A statement is misleading if "in the light of the facts existing at the time ... [a] reasonable investor. . . would have been misled[.]" *Bush*, 2023 WL 8263037 at *6; *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).

With regard to falsity of their statements, Defendants argue that they had no duty to disclose anything beyond what they disclosed about Icahn's margin loan, claiming that they were not required to disclose its amount, that it had LTV ratios linked to stock price, or the material risk of LTV de-linkage. MTD at 16-18. Defendants also contend that IEP's financial reporting was not untrue. MTD 25-26. However, Defendants' omissions are actionable in light of other disclosures by IEP.

17

In *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1312-13, 1317 (5th Cir. 1977) ("FVB"), the Fifth Circuit sustained a jury verdict against defendants where the jury found "actionable omissions" and a duty to speak given their "superior knowledge" and a corresponding duty to "avoid half-truths" where defendants inflated assets "to present a more favorable picture" in advance of a merger and had failed to timely write off assets. *Id*. at 1312-13. Here, IEP concealed the Dividend Inducement Scheme even when speaking about dividends and the bases for determining their amount. ¶ 67. IEP further concealed and delayed a $226 million impairment charge until the completion of a public offering despite repeatedly discussing efforts to improve the Auto segment. ¶¶ 219, 231, 236, 248. Defendants' failure to speak the whole truth rendered their prior speech misleading or deceptive, despite their duty to disclose. *See Findwhat*, 658 F.3d at 1305; *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir.2009) (disclosure requirement "is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers").

Defendants twist the CCAC's allegations that Jefferies reported that the dividend was sustainable "into perpetuity" at then-current levels, claiming they have no duty to correct Jefferies. MTD at 23. They miss the point. The long-running grant of heightened dividends - the instrument of the Scheme – worked so well in creating a false impression of sustained conduct, amid inconsistent financial metrics and liquidity, that the market, as reflected by an experienced analyst at Jefferies, was persuaded to see a false picture of IEP, confounded by Defendants' statements, deceptive conduct, and ongoing lack of transparency." ¶197. Just as in *Luczak v. Nat'l Beverage Corp.*, 812 Fed. Appx. 915, 924-25 (11th Cir. 2020), Plaintiffs challenge Defendants' statements because they were accompanied by omissions and "specific strategies and metrics the company

18

said it was using," which the reasonable investor relied on to their detriment, creating factual issues, which "it is improper" to decide on a motion to dismiss. *Id.*

Importantly, IEP issued statements designed to contradict the truth reflected by the Hindenburg Report (¶¶259-260, 267-69), doubling down on the Scheme while both Papapostolou and Willets engaged in "full-fledged damage control" during the May 10, 2023 Conference Call to "assure[] investors." ¶¶ 271-75. Assurances that IEP's financials and "dividend policy" were correct, amid yet another $2 quarterly dividend, demonstrates that these defendants were in a "unique position" to determine and disclose the truth about these issues important to reasonable investors. *Lickteig v. Cerberus Capital Management, L.P.*, 589 F. Supp. 3d 302, 327 (S.D.N.Y. 2022) (assurances and defendants' unique position to make determination create issues for the trier of fact). *Bush*, 2023 WL 8263037 at *22 (statements are misleading where they "convey[] to the public a false impression"). Stating an actionable deceptive Scheme and actionable misrepresentations and omissions, the CCAC is far from a so-called "puzzle pleading." MTD at 15.

### 2.   The Challenged Statements Are Not Protected Opinions

Defendants' manipulation of valuations through inflation of INAVs and failure to timely disclose the need to write down impaired assets or the looming bankruptcy in the Automotive Segment are not, as Defendants argue, protected opinion. MTD at 26-27. A statement is opinion only when it is expressly stated as a belief or opinion. *Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pension Fund, et al.*, 575 U.S. 175, 185-86 (2015). The majority of Defendants' statements were not so qualified but are instead actionable statements of present fact under *Omnicare. See, e.g. Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848 (N.D. Tex. 2018) ("alleged GAAP

19

violation and ... failure to recognize the impairment of the [asset] are not opinion statements but create a fact question").

Plaintiffs do not, as Defendants argue, seek to hold Defendants liable on the basis of their opinion. MTD at 26-28, 31, 34-35. In *FVB*, 559 F.2d at 1318, the Fifth Circuit deemed so-called "opinions" to be statements of fact, explaining that, where a corporate executive was in effect stating how defendant's "pending policies applied," or where challenged statements include that defendant:

> . . . ran an above-average operation and has always met their obligations promptly are to be seen as facts. ***These statements are akin to representations as to financial condition, which are clearly actionable.*** To be sure, these statements reflect a certain amount of evaluation, but … ***the statements resemble a recital of raw fact[s] more than they resemble a prediction of future stock prices***.

*FVB*, 559 F.2d at 1318. The same applies here. Statements such as those assuring that there is sufficient liquidity to fund the dividend, or that INAV is more representative of value than GAAP or is "helpful" to investors, are representations of financial condition, and recite raw facts, not opinions.

IEP uses INAV "as an additional method for considering the value of the Company's assets" that Defendants believed to be "**more indicative**" **of value than GAAP**. ¶ 188. Unbeknownst to investors, the INAV, not governed by GAAP, could more easily be manipulated. ¶¶306-308, 310-316. Plaintiffs allege that Defendants manipulated INAV in a deceptive manner, to create an illusion that the dividend was sustainable on the Company's ordinary operations. ¶302 (noting three distinct manipulations); ¶308 (INAVs substantially exceeded GAAP NAVs); ¶315 (Automotive INAV artificially inflated by 45%). The CCAC alleges that CEO Kekedjian, Willets, when serving as CFO and then as CEO, and CFO Papapostolou, were not transparent when they were directly questioned by analysts during conference calls about Automotive asset values,

20

related charges, and the ultimate bankruptcy of Auto Parts, for the Third Quarter 2021 and the Fourth Quarter 2022. ¶ 17; ¶ 189; ¶ 192; ¶ 204; ¶¶ 236-237; ¶ 243; ¶¶ 245-246; ¶ 248(c)-(e); ¶ 262. In an unusual moment of candor, discussing the Auto Parts bankruptcy during the Fourth Quarter 2022 Conference Call, CEO Willetts acknowledged "a number of items that were not to our liking", and that IEP needed to "post an excess and obsolete inventory methodology" adding that "frankly, there are other items that we had to recognize that *should have been recognized perhaps a little bit more promptly* than they have been between Q4, and Q1, 2 and 3." ¶ 247.

Defendants' contention that IEP's use of INAVs were statements of honest opinion ignores Plaintiffs' allegations that these statements confounded the market, creating an illusion that IEP's dividend was based on represented metrics, thus sustainable. MTD at 26-28. "[T]he proper inquiry requires an examination of defendants' representations, taken together and in context" and the "literal truth of an isolated statement is insufficient" without context. *Id*. at 326. Moreover, statements regarding the dividend are akin to actionable "representations as to or [of] financial condition." *FVB*, 559 F.2d at 1218. And, just as the court in *MAZ Partners* held that the "some of the statements made by First Choice" "namely the SOX certifications and the risk disclosures in the SEC filings," were rendered misleading by the failure to disclose the stock manipulation scheme, here, Defendants statements about INAVs rendered IEP's financial disclosures, risk disclosures, and SOX certifications misleading; they were not opinions, but operated on the market as actionable representations of financial condition. 2019 WL 5394011 at *16; *accord, FVB*, 559 F.2d at 1218. Defendants' use of GAAP and "non-GAAP" metrics "created an impression of a materially different state of affairs than the one that actually existed." *Jackson v. Microchip Tech. Inc.*, No. CV-18-02914-PHX-JJT, 2020 WL 1170843, *9 (D. Ariz. March 11, 2020) (use of "non-GAAP" measures are actionable "false or misleading statements", not mere opinions).

21

### 3.   The Challenged Statements Are Not Insulated By the Safe Harbor

Misrepresentation of the basis for determining dividends is not a projection. Nor can Defendants contend that their false statements and omissions were "forward-looking," and thus, inactionable. MTD at 21-22, 24. Defendants contend that their actions regarding the dividend are supported by a so-called "Partnership Agreement," but Defendants cannot contract away liability for fraud. MTD at 7. *See Glob. Quest LLC V. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027-29 (11th Cir. 2017). And in any event, the PSLRA provides that its safe harbor does not "apply to a forward-looking statement . . . that . . . relat[es] to the operations of, a partnership . . .." 15 U.S.C. § 78u-5(b)(2)(E). Congress's explicit exclusion of limited partnerships from the protections of the safe harbor was intentional. *See, e.g.*, 141 Cong. Rec. S17933-04, 141 Cong. Rec. S17933-04, S17934 (Senator Alphonse D'Amato: "The conference report safe harbor does not cover areas where there is potential for abuse [such as] . . . limited partnerships"); 141 Cong. Rec. S9109-05, 141 Cong. Rec. S9109-05, S9121 (Senator Bob Bennett: "limited partnership[s]" were among "the pirates who would be denied the right to sail into this particular harbor, by the bill").

Moreover, "[t]he safe harbor does not apply, however, to forward-looking statements made with 'actual knowledge ... that the statement was false or misleading.'" *In re Catalina Mktg. Corp. Sec. Litig.,* CASE NO.: 7:16-CV-222 (WLS), 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005); accord *In re Flowers Foods, Inc. Sec. Litig*., 2018 WL 1558558, at *11 (M.D. Ga. Mar. 23, 2018) (where actual knowledge is sufficiently alleged, "forward-looking statements . . . are not shielded by the PSLRA"). Similarly, the Eleventh Circuit Court of Appeals held that cautionary or risk-disclosing language does not shield statements premised on half-truths: ***"Defendants' failure to disclose these defects rendered their statements materially misleading, which was not cured by any general cautionary or risk disclosing language***." *FindWhat*, 658 F.3d at 1298-1299. *In re*

22

*Scientific-Atlanta, Inc. Sec. Litig.* 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002) ("[b]oilerplate warnings will not suffice as meaningful cautionary statements .... [which] must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement"). There, the court held defendants' failure to disclose channel stuffing "'altered [the] perception of market conditions and therefore constituted omission of material fact.'" *Id.* at 1363 (quoting *Sherleigh Assoc., LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1270 (S.D. Fla. 2000) (failure to disclose lack of business license)). Just as the risk disclosures and cautionary language here failed to warn of or disclose the Dividend Inducement Scheme, the misrepresented basis for setting the quarterly dividends and the material risk of LTV de-linkage (¶¶ 92, 135, 165, 210, 249, 294), the risk disclosures in *Sherleigh Assocs.* failed to warn of the risk to operations that the lack of a business license there would likely cause:

> The Court finds the cautionary language, both in the aggregate and when analyzed for specifics, ***when cast against the alleged omissions and misstatements here***, did not fairly and adequately warn potential investors of the alleged risks associated with investing. . . the Court finds the . . . safe harbor provision does not apply.

178 Supp. 2d at 1274. *See also*, *MAZ Partners,* 2019 WL 5394011, at *13 (generalized disclosures about fluctuating stock price "did not include a forewarning about market manipulation schemes;" where plaintiff alleges "Defendants' knowledge of/involvement in the alleged . . . scheme, it appears that the bespeaks caution doctrine may not apply"); *FindWhat*, 658 F.3d at 1299 ("inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts"). The same conclusion should be reached here.

### 4.   The CCAC Sufficiently Pleads Speakers and Statements

Plaintiffs allege that IEP's financial statements and Forms 10-K as well as interim financial statements and Forms 10-Q for the quarterly periods ended March 31, June 30, and September 30, for the years ending December 31, 2018, through December 31, 2022, were untrue. ¶¶ 321-363.

23

During the early part of the Class Period, IEP issued press releases and filed reports with the SEC while then CEO Cozza and CFO Cho spoke to the market about the Company's quarterly and annual financial results, liquidity, INAVs and dividends, misleading the market. All the while conducting the Dividend Inducement Scheme (*e.g.,* ¶¶ 85, 87, 95, 112, 114, 125, 131, 136, 145, 154, 166), Cozza and Cho encouraged the market to rely on IEP's reported INAVs as "helpful to investors." ¶¶97, 107, 117-18, 124, 137, 153. Cozza and Cho touted IEP's liquidity, particularly in light of its at-the-market sales of units. ¶¶ 100, 102, 105, 121, 129, 141, 149, 157, 173, 400. Defendants Cozza and Cho also discussed the fact that IEP's "Automotive segment [was] in the process of implementing a multiyear transformational plan, which includes the integration and restructuring of the operations of Pep Boys and Auto Plus." ¶¶ 89-90, 99, 110, 119, 120, 128, 139, 140. Plaintiffs allege that while analysts repeatedly asked about the Company's Automotive Segment (¶¶ 130, 142), when Defendant Cozza was asked specifically about "any onetime costs," he baldly stated, "I don't anticipate any material onetime costs…." ¶¶ 150, 174.

By late-2021, senior management had turned over and the deception continued, with IEP issuing press releases and filing reports with the SEC while Kekedjian and Willets spoke to the market about the Company's quarterly and annual financial results, liquidity, INAVs, and dividends, in support of the Dividend Inducement Scheme. *See e.g.,* ¶ 184. These Defendants encouraged the market to rely on IEP's reported INAVs, with Kekedjian noting "we believe that this information is more indicative of value than GAAP." ¶ 188. Defendants again touted IEP's liquidity, particularly in light of its at-the-market sales of units. ¶¶ 188, 190, 400. As Kekedjian explained when asked about the sustainability of the dividend, "[w]e definitely have a high dividend yield and that's one of the factors that makes the stock attractive." ¶184. Kekedjian further reminded investors of IEPS' long history of consistent distributions: "[t]his track record has

24

allowed IEP to pay 66 consecutive distributions to its unitholders since 2005 while increasing the distribution over time." ¶ 186. Kekedjian and Willetts also discussed the Automotive Segment without disclosing the risk of write downs or decreased valuation. *See* ¶¶ 183, 188 (Kekedjian), ¶¶ 189, 191-92 (Willetts). The market, even an experienced analyst at Jefferies, was persuaded to see a false picture of IEP, especially with respect to quarterly dividends, unable to connect the dots as a consequence of the Defendants' Dividend Inducement Scheme. ¶ 197.

By February 2022, Willetts was promoted to CEO and Papapostolou was named as IEP's CFO. ¶ 198. Throughout 2022, Willetts and Papapostolou discussed IEP's Automotive Segment without disclosing the risk of write downs and charges, decreased valuation, or bankruptcy. ¶¶212-213, 219-220, 228, 230-32. Papapostolou assured the market that IEP had sufficient liquidity. ¶214. Nevertheless, on January 31, 2023, IEH Auto Parts Holding LLC filed for bankruptcy, noting estimated liabilities between $100 million and $500 million. ¶¶ 236, 243.

Plaintiffs further allege that Second Quarter 2023 Press Release was itself deceptive and misleading, wherein Icahn stated, "in [his] opinion" renegotiation of his personal loan covenants "significantly diffused the effects" of the Hindenburg Report "and focused on our activist strategy and reduced our hedge book," asserting that "[t]hese actions have been a major factor in what I believe is IEP turning the corner …." ¶¶ 285-87. Despite those remarks, IEP shocked the market, announcing a $1.00 per unit dividend, the lowest in more than a decade. ¶ 289.

Plaintiffs allege these public statements failed to inform the market that (a) Defendants deployed the Dividend Inducement Scheme; (b) the LTV ratios in Mr. Icahn's debt covenants were tethered to IEP's unit trading price, creating a material undisclosed risk of LTV de-linkage; (c) IEP's INAVs were substantially inflated at all times, exceeding GAAP NAV and creating a misleading picture of the value of the Company's assets; (d) triggering events required IEP to

perform an impairment analysis of the Automotive Parts segment, which IEP deceitfully delayed until IEP reported its first quarter 2023 results, while it completed a public offering; and (e) the Company's ordinary operations could not support its distribution of dividends. ¶ 294.

Plaintiffs' allegations are sufficiently particularized, providing the "who, what, where, when and how" of the alleged fraud, demonstrating specific Defendants who issued "positive statements" that "attempted to mask" then existing "adverse information and its significance" when speaking to the market. *In re Physician Corp. of Am. Secs. Litig.,* 50 F.Supp.2d 1304, 1308 (S.D.Fla.1999). Plaintiffs' allegations are not "group pleading." MTD at 37. To be sure, statements about the sustainability of the dividend are actionable. *See Murray*, 2023 WL 4295600 at *5 (finding statements re: support for "continued payment of . . . dividends" actionable). Finally, Plaintiffs plead "a longstanding course of misconduct" by which each Defendant made specific misleading statements or omissions that misled the market. *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1374 (S.D. Fla. 2015).[6]

### 5. The CCAC Sufficiently Pleads Deceptive Financial Manipulations

In addition to, and in support of, the Scheme, and the untrue statements and omissions, Plaintiffs also allege specific deceptive financial manipulations. "Manipulation" is "virtually a term of art when used in connection with securities markets." *Alabama Farm Bureau*, 606 F.2d at 612 (*citing Santa Fe Indus.*, 430 U.S. at 476 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,

---

[6] Defendants rely on two cases that stand for the proposition that a broker does not need to disclose to a customer that a market decline could precipitate a margin call where the customer signed a margin agreement detailing the operation of the margin account. *See Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 164 (S.D.N.Y. 1986); *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984) (pro se plaintiff) (no injury alleged). Such a principle is inapposite here because unlike *Newman* and *Zerman*, Plaintiffs did not enter into Icahn's margin agreement; Icahn did; he agreed to the undisclosed terms of the LTV ratios contained therein, not Plaintiffs, and Plaintiffs were injured. ¶ 68. Here, Defendant did not disclose and misrepresented to investors the true basis for setting dividends. The Court should not rely on *Newman* and *Zerman*.

199 (1976)). "The term refers generally to practices ... intended to mislead investors by [a]rtificially affecting market activity." *Id.* "Manipulation' has referred, in general, to ***devices used to induce investment*** in a company's stock…." *Id.* Section 10(b)'s deceptive manipulations provision is "described rightly as a 'catchall' clause" to enable parties to handle "new manipulative (or cunning) devices" as they may arise. *Id* at 612-13 (citing *Ernst & Ernst*, 425 U.S. at 203). Because this is "remedial" legislation, it must be construed "'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Id.*

Plaintiffs allege that Defendants caused IEP to engage in financial manipulations "to maintain the illusion that the Company's financial condition was sound, and that it had adequate liquidity to fund the dividends in furtherance of the Dividend Inducement Scheme." ¶¶ 295-317. Plaintiffs allege that Defendants did several things to support the Scheme. To maintain control of IEP and build collateral, Icahn almost always elected to take his dividends in units in lieu of cash. *Id.* IEP generated additional cash flow through at-the-market sales of additional units to the public at inflated prices to fund cash dividends, while delaying the Auto Parts bankruptcy until completion of those sales. *Id. See also* ¶400. IEP manipulated INAVs to mislead the market. ¶302. Plaintiffs demonstrate that IEP's INAVs, at all times, well exceeded its GAAP NAVs. ¶308. Plaintiffs further demonstrate that the INAV of the Automotive Segment was inflated by 45%. ¶315. This is underscored by the Auto Parts bankruptcy and related write-downs. *Id.* IEP's efforts to focus the market on its INAVs created a misleading picture of the Company's financial condition. ¶¶ 311-16.

*In Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, No. CV-21-01995-PHX-JJT, 2023 WL 1800963, \*15-\*16 (D. Ariz. Feb. 7, 2023), plaintiffs alleged defendants "manipulate[ed] non-GAAP measures" and that "non-GAAP" reporting was misleading. The court concluded that it

was "facially plausible" that the "non-GAAP" measures were "deceptive" and "manipul[ative]." *Id.* at \*15-\*16. Here, Plaintiffs allege Defendants manipulated non-GAAP measures in a deceptive and manipulative manner. ¶¶ 295-317; ¶302 (non-GAAP measures maintain illusion that IEP's finances were sound with sufficient liquidity to fund dividend); ¶308 (non-GAAP measure of fair value exceed GAAP); ¶315 (Automotive Group INAV inflated by 45%). "[D]efendants were not obligated to report non-GAAP measures, once they chose to do so, they were bound to do so in a manner that wouldn't mislead investors.'" *Id.* Plaintiffs' theory of the sophisticated Scheme may be unique, but the federal securities laws were designed to catch such "new manipulative (or cunning) devices" as they may arise in time. *Alabama Farm Bureau*, 606 F.2d at 613 (citing *Ernst & Ernst*, 425 U.S. at 203). Here, the CCAC sets forth plausible, cunning, and deceptive financial manipulations.

### 6.   The CCAC Sufficiently Pleads GAAP Violations

A statement made in violation of GAAP "may constitute the false and misleading statements of material fact necessary for alleging a violation of Rule 10b-5." *In re Physician Corp. of Amer. Sec. Litig.*, No. 97-3678-CIV, 2002 WL 34477593, \*7 (S.D. Fla. July 25, 2002) (*citing In re Physician Corp. of Am. Secs. Litig.*, 50 F.Supp.2d at 1317 n.17). "Financial statements . . . which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures unless the Commission has otherwise provided." *Id.* (*citing* Regulation S–X, 17 C.F.R. §§ 210.1–02(s)(2), 249.308a). Allegations of GAAP violations are fact-specific, and their determination often depends on expert testimony. *Physician Corporation of America*, 2002 WL 34477593 at \*7. Here, Plaintiffs plead more than a mere disagreement with management's accounting treatment.

Plaintiffs allege that Defendants violated GAAP by failing to timely mark down assets in IEP's Auto Segment. ¶¶ 327-63. Plaintiffs allege that IEP failed to recognize certain triggering events or "qualitative factors," that required IEP to mark down its Auto Segment assets during the Class Period including lessening demand, supply chain disruptions, inflation, the COVID pandemic, declines in the realizable value of inventory, declining value of inventory resulting from reorganization, adverse macroeconomic factors in the automotive industry, and poor financial performance. ¶ 335. Plaintiffs allege specific triggering events in 2019 (¶¶ 341-42), 2020 (¶¶ 343-44), 2021 (¶¶ 345-46), and 2022 (¶¶ 347-48). Plaintiffs allege that Icahn and the respective CEOs and CFOs concealed these adverse facts and the consequential inflated values of the Automotive Segment until 2023, just after IEP completed a public offering of new units. ¶¶ 350-56. The alleged GAAP violations "distorted the financial information available to the public, and these allegations are sufficient to state a claim." *Scientific-Atlanta*, 239 F. Supp. 2d at 1363.

Likewise, with regard to the Sarbanes-Oxley certifications that Plaintiffs here allege each of the CEO and CFO Defendants except Kekedjian executed (see ¶¶ 357-63), in *MAZ Partners* the court explained that "where the complaint asserts facts indicating that, at the time of the [SOX] certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their [SOX] certification erroneous, a false or misleading certification may form the basis of a § 10(b) and Rule 10b-5 claim." 2019 WL 5394011 at *11 ("SOX certifications were rendered materially misleading based on the omission regarding the stock manipulation scheme, which could form an actionable basis for a securities fraud claim"). Plaintiffs challenge specific statements in the SOX certifications -- certifications that the SEC filings complied with GAAP, did not omit material information, and that any fraud, material or not, had been disclosed. *Accord id.*, fn.10. The determination of those issues is for the fact finder.

29

**D.      A Strong Inference of *Scienter* is Alleged**

Under Rule 9(b) and the PSLRA, a complaint must plead, with particularity, facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless in making the allegedly materially false or incomplete statements. Severe recklessness is established by:

> those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*FindWhat*, 658 F.3d at 1300; *see also Thorpe*, 111 F. Supp. 3d at 1374-77; *In re Premier Tech. Inc. Sec. Litig.*, No. 1:98-cv-1804-JOF, 2000 WL 33231639, *17 (N.D. Ga. Dec. 8, 2000) (*citing Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1335-36 (N.D. Ga. 1998) (allegations of GAAP violations sufficient to plead securities fraud).

"[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" and the absence or presence of any one *indicium* is not determinative. *Tellabs v. Makor Issues & Rights, LTD., et al*, 551 U.S. 308, 326 (2007). Courts must "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of *scienter* allegation." *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir 2008). "In assessing the allegations *holistically*, as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of *scienter* viewed with a practical and common-sense perspective." *Id.* "Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Inst. Inv. Grp. v. Avaya*, 564 F. 3d 242, 272-73 (3rd Cir. 2009) ; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("context-specific task that requires the reviewing court to draw on its judicial experience and common sense"); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th

Cir. 2004) ("[w]e readily join the courts that have interpreted the PSLRA to permit the aggregation of facts to infer *scienter*").

The *scienter* analysis boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew of the alleged fraud (or were severely reckless in not knowing of it). *Luczak*, 812 Fed. Appx at 925 ("at least as likely as not"). Where equally compelling competing inferences may be drawn, the tie goes to plaintiff. *See In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008). Defendants repeatedly rely on arguments supported by cases that treat the *scienter* analysis in piecemeal fashion. *See, e.g.* MTD at 37, 38, 40, 44, 47, 50. This attack is inconsistent with *Tellabs* and Eleventh Circuit jurisprudence.

A variety of facts and circumstances can support an inference of *scienter*. In the Eleventh Circuit, "*scienter* can be inferred when a defendant's position and responsibilities establish other particular facts probative of *scienter*" and "[a]n inference of scienter is bolstered" by allegations indicating that the subject of the alleged fraud was a "core operation" of the company. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, *at* *14 (citing *Thorpe*, 111 F. Supp. 3d at 1376 (core operation coupled with the allegations that defendants knew of illegal practices sufficient to prove scienter)). *Scienter* can be strongly inferred "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." S. Ferry LP #2, 542 F.3d at 786. *See also, In re Immucor Inc. Sec. Litig.*, No. 1:05-CV-2276-WSD, 2006 WL 3000133, at *18 (N.D. Ga. 2006) ("knowledge of facts relating to the core functions of a company can be imputed to a company's key officers"); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) ("As corporate officers and insiders, the defendants must have been aware of the information contained in the press release"). An inference

31

of *scienter* exists where "the wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business." *In re Faro Techs. Sec. Litig*., 534 F. Supp. 2d 1248, 1262 (M.D. Fla. 2007). The inference is particularly strong where, as here, "the fraud flowed from the top-down." *See Fresno Cty. Emps. Ret. Ass'n. v. Comscore, 268* F. Supp. 3d 526, 551-552 (S.D.N.Y 2017). *Lapin v. Tupperware Brands Corp., (In Re Tupperware Brands Sec. Litig.)*, Case No: 6:20-cv-357-Orl-31GJK, 2021 U.S. Dist. LEXIS 13632, \*8 (M.D. Fla. Jan. 25, 2021) (the "Eleventh Circuit has recognized that it is possible to state a § 10(b) claim against a corporate defendant alone"). "Acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation." *In re Spear & Jackson*, 399 F. Supp. 2d at 1361 (*citing In re Sunbeam Sec. Litig.*, 89 F. Supp.2d 1326, 1340 (S.D. Fla. 1999)). "There are . . . plenty of . . . cases where the CEO's attempts to inflate his company's stock price are imputed to the corporation." *Id; see Hubbard v. BankAtlantic Bancorp, Inc*., 625 F. Supp. 2d 1267, 1288-89 (S.D. Fla. 2008) (*scienter* of corporate officers imputed to the corporation).

A strong inference of *scienter* exists where the complaint alleges that defendants had access to information contradicting their public statements. *In re Sci. Atlanta, Inc. Sec. Litig*., 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010), aff'd sub nom; *Phillips v. Sci.-Atlanta, Inc*., 489 F. App'x 339 (11th Cir. 2012). Or where the defendants "egregious[ly] refus[ed] to see the obvious or investigate the doubtful," *In re Hamilton Bankcorp., Inc. Sec. Litig*., 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002), a*ccord In re Equifax Inc. Sec. Litig*., 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019) ("knowledge of facts or access to information contradicting their public statements") (collecting cases).

"[W]henever a defendant engages in clearly manipulative practices, and then conceals those practices by making misstatements, the concealment is presumptively done with the intent

to defraud." *MAZ*, 2019 WL 5394011, \*16 (addressing claims under Section 10(b) and Rule 10b-5). When a defendant makes a statement or acts repeatedly, it can more strongly evince an inference that the defendant spoke with *scienter*. *Theodore v. Purecycle Technologies*, 2023 WL 4035880 (M.D. Fla. 2023); s*ee In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138-39, 1147 (D. Colo. 2005) ("sustained pattern of repeated manipulations and misrepresentations" supported inference of *scienter*); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) ("*scienter* pleading requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct"); *Pippenger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1419 (S.D. Ind. 1994) (*scienter* "established by a pattern of intentional deception").

GAAP violations, which serve as one mechanism for misleading investors regarding the corporate financial picture, are yet another piece of evidence supporting an inference of *scienter*, especially in combination with "red flags" of impropriety. *In re PSS World Med. Inc. Sec. Litig.*, 250 F. Supp. 2d at 1350 (persistent GAAP violations, coupled with allegations of motive, support strong inference of *scienter*); *In re Sunbeam*, 89 F. Supp. 2d at 1326, 1338-39 (S.D. Fla. 1999) (continuing nature of fraud, persistent accounting irregularities, and motive allegations amounted to a strong inference of *scienter*)*; Paincare*, 541 F. Supp. 2d at 1292 (magnitude of an impairment charge can also support a strong inference of *scienter*)*; In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 316-17 (D. Mass. 2006) ("Ibis was obviously aware of the eventual need to write-down the equipment. There were no changes . . . which would explain the delay"); *In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 953-54 (N.D. Ca. 2017) ("allegations related to the timing and size of the impairment" further support scienter).

Motive is *indicia* of *scienter*. Motive and opportunity can serve as circumstantial evidence supporting a strong inference *scienter. Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a *scienter* inference."). *See also Eastwood*, 2009 WL 3157668 at *4 (proceeds from insider stock sales supported a strong inference of *scienter*); *SEC v. Gane*, Case No. 03-61553-CIV-SEITZ, 2005 U.S. Dist. LEXIS 607, *42, *43 (S.D. Fla. Jan. 4, 2005) ("courts routinely, and properly, look to evidence of motive when evaluating what inference to draw from the facts"); *see In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d at 1358-59 ("motive and opportunity … are relevant as a component of showing severe recklessness"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (desire to raise capital through public offerings is probative of *scienter*).

Additionally, a "government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of *scienter.*" *Thorpe,* 111 F. Supp. 3d at 1376; s*ee Theodore*, 2023 WL 4035880 at *8 (plausible claim of *scienter* where there was an SEC investigation into the company's management).

The top-down Dividend Inducement Scheme, perpetrated at the behest of controlling shareholder Icahn against minority shareholders, inflated unit prices while maintaining Icahn's controlling interest over the course of more than $1.7 billion in public offerings. The CCAC adequately alleges that **Icahn**, IEP's controlling shareholder, orchestrated the Dividend Inducement Scheme. ¶¶ 280, 411-413. Icahn knew the undisclosed and actively concealed terms of his own personal margin loan debt covenants, knew its LTV ratios were linked to IEP's unit trading price and knew that such material information was continuously concealed from investors even in the face of analyst concern about IEP's lack of transparency. ¶¶ 8, 68, 250. As discussed below, when viewed *holistically* – not in piecemeal fashion – these facts demonstrate a strong

34

inference of *scienter*. "While each of these allegations in isolation would be insufficient to support a finding of severe recklessness, the combination of the facts included in the complaint satisfies Plaintiffs' burden[.]" *Scientific-Atlanta*, 239 F. Supp. 2d at 1366.

Icahn possessed the tools and the instruments to carry out the Scheme. As chair of the board of IEP's general partner, Icahn granted IEP's heightened dividends. ¶ 391. IEP's CFOs and CEOs were participants in that organization, sitting as co-directors of the board chaired by Icahn. He and the board of the general partner of IEP put in motion the Dividend Inducement Scheme. Icahn's conduct was an extreme departure from the standard of care he owed arising from **his fiduciary duty as a controlling unitholder** to the Plaintiffs and **minority unitholders** that comprise the Class herein. ¶ 393. "A shareholder owes a fiduciary duty to other shareholders . . . if (1) it owns a majority interest, or (2) it controls the business affairs of the corporation". *In re U.S. Sugar Corp. Litig.*, 669 F. Supp. 2d 1301, 1311 (S.D. Fla. 2009).

Given his vast **expertise** and **experience,** a reasonable inference arises that Icahn knew of the connection between dividend grants and the buoying IEP's trading price. ¶ 387-89, 411. It is reasonable to infer that he knew trading prices would fall absent granting heightened dividends. ¶ *Id*. Hence, he continued higher dividends, deceptively propping up IEP's unit trading price to better protect or insulate himself. ¶ 9, 277-78. It is therefore reasonable to infer – as logic and common sense would dictate – that he had **actual knowledge of his own deception and scheme to inflate trading prices**, **deceiving investors** into paying more for their IEP units than they otherwise would. ¶ 393.

Each Form 10-K, signed by Icahn and the then-CEO and then-CFO, stated:

> ***Our general partner, and its control person, has significant influence over us.***
> Mr. Icahn, through affiliates, owns 100% of Icahn Enterprises GP, the general partner of Icahn Enterprises and Icahn Enterprises Holdings, approximately 92.0%

> of Icahn Enterprises' outstanding depositary units as of December 31, 2019, and, as a result, has the ability to influence many aspects of our operations and affairs.

¶ 391. As IEP's controlling unitholder, Icahn had **unfettered access to information.** Given that he **executed IEP's Annual Reports on Form 10-K** throughout the Class Period, he was aware that the heightened dividends were being granted quarter after quarter, year after year, and certainly that, pursuant to the Dividend Inducement Scheme, it was based on his margin loan LTV ratio concern rather than IEP's financial performance or liquidity. ¶ 67. With respect to IEP's "Core Strength[s]," the Form 10-Ks that Icahn, Cozza, Cho, and Willetts signed, stated as follows, further supporting *scienter*:

> Our CEO is **accountable directly to** our Board of Directors of our general partner, including the Chairman, **Carl C. Icahn**, and has day-to-day responsibility, **in consultation with our Chairman**, for general oversight of our business segments. **We continually evaluate** our operating subsidiaries with a view towards maximizing value and cost efficiencies, bringing an **owner's perspective** to our operating businesses.

¶ 392.

*Scienter* is buttressed by Mr. Icahn's motive to deceive investors in order to **shelter himself from a margin call** on his **$3.7 billion margin loan.** ¶¶ 409-412. Defendants concealed the true basis for setting dividend amounts and misrepresented the bases on which dividends were determined. ¶ 67. The heightened dividend rewarded Icahn with even more units amid market offerings, helping retain his tight control over IEP. ¶ 303. Motive and opportunity supporting *scienter* also arise by virtue of IEP's **at-the-market offerings** through March 31, 2023, totaling almost $1.7 billion, **funding the dividends used to buoy and inflate IEP's trading price**, in turn enabling IEP to offer fewer units to the public than it otherwise would, as Icahn's net worth increased with IEP's trading price. ¶ 385.

Defendant Icahn's *scienter* is further demonstrated by the delay in taking a charge of $226 million until after almost $1.7 billion of offerings were completed by the end of the first quarter

36

of 2023. Icahn, Willetts, and Papapostolou signed the 2022 Form 10-K, which failed to disclose the charge and its material, adverse impact on IEP's financial results.

Icahn's intent to deceive is evidenced by his doubling down following publication of the Hindenburg Report. IEP's statements on May 4 and May 10, 2023, tacitly acknowledge that Icahn read, and was aware of, the Report's findings regarding inflated asset valuations, inflated unit trading price, and the unsustainability of the heightened quarterly dividend. ¶ 415. Further demonstrating *scienter*, Mr. Icahn led a fight against Hindenburg, falsely denying the Report's accuracy and even villainizing it. ¶¶ 259, 267-270. In the face of the Hindenburg Report and inquiry by the U.S. Attorney's Office for the Southern District of New York, Icahn doubled down, furthering the Dividend Inducement Scheme by announcing yet another $2 per unit quarterly dividend on May 10, 2023 (¶¶ 261, 275), further demonstrating his intent to deceive investors ¶ 415.[7] A failure to further admit the truth can establish *scienter.* In *In re PainCare Holdings Secs. Litig.*, 541 F. Supp. 2d at 1292-1293 (giving "false reason for the accounting errors immediately after acknowledging the accounting errors leading to the massive restatement supports an inference of recklessness"); *Thorpe*, 111 F. Supp. 3d at 1374-75 (defendants' "response" to a "complaint" supports scienter).

Defendants repeatedly spoke about IEP's Automotive segment – stating its asset value in 2022 and certainly in Q4'22. As discussed in § III. C. 4. *supra,* IEP **delayed a charge of $226 million** associated with its Auto Plus division. This did not occur overnight, nor did the bankruptcy filing just thirty days after the close of fiscal year 2022. ¶¶ 243-249. These facts support *scienter*.

---

[7] Defendants improperly assert self-serving facts outside the CCAC to explain the 50% dividend cut. MTD at 12. They are untrue and must be rejected. In any event, they too are a deception, Defendants never asserted that yield was a relevant factor in setting IEP's dividends. And IEP's prior course of conduct reflects granting $2 dividends when IEP unit trading prices were in a similar range as they were immediately before the August 3, 2023 dividend cut.

IEP's reported INAVs materially exceeded GAAP NAV, these INAVs depended on the **chosen valuation methodology** applied as well as assumptions regarding the inputs to the valuation calculations. ¶¶ 19, 308. There were numerous discrepancies in IEP's INAVs that inflated them, causing them to be misleading. ¶¶ 309-317. Among them, IEP increased its valuation of its Automotive Segment by over $1 Billion in just one quarter – Q2 '21 to Q3 '21, the timing of which was highly suspicious given the Company's disclosure that the COVID-19 pandemic negatively impacted the segment prompting an acceleration of store closures, which logically would normally result in a reduction in value, not an increase of over $1 Billion. ¶¶ 314-315. A little more than a year later – the quarter ending March 31, 2023 – the Automotive Group was marked down to $1.404 Billion – less than its value before it was suspiciously inflated in Q3 '21. ¶¶314-315. Mr. Icahn, who executed the 2021 10-K reporting the valuation increase, was aware of this large discrepancy. It can be reasonably inferred that he was aware of IEP's suspicious INAV valuations. ¶¶ 387-389. It can also be reasonably inferred that Icahn was consulted respecting asset valuations given representations respecting IEP's "core strength" in its Form 10-K. ¶¶ 302, 391-92.

Asset Valuation is "**core**" to IEP's business (¶¶ 387-389) and Defendants admit they selected the IEP's INAV methodologies. ¶ 395. Lack of transparency regarding assets values was the product of purposeful practice by Defendants, intended to reflect higher values compared to GAAP, furthering the Scheme. Defendants knew, or were severely reckless if they did not know, that **asset values** were **manipulated,** and thus inflated, because they **deployed** these **deceptive methodologies**. ¶¶ 394-398. This ongoing lack of transparency further supports a strong inference of *scienter.* After all, "books do not cook themselves." *In re: McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000); *accord SEC v. Dunlap*, No. Case No. 01-8437-CIV-

MIDDLEBROOKS, 2002 WL1007626, *6 (S.D. Fla. March 27, 2002) (defendant's proposed non-GAAP practice and rationale supported scienter).

These were top-down determinations, raising a strong inference of actual knowledge as to Icahn because he was in charge, his acumen being IEP's "core strength." ¶¶ 391-92.

During the Class Period, IEP had 3 different CEOs and 3 CFOs under the command of Icahn. ¶¶ 43-48. Cho, Cozza, Kekedjian, Papapostolou, and Willets each held positions as members of the boards of IEP, IEP Holdings, and IEP general partner, Icahn Enterprises G.P. Inc. ¶¶ 41-48. As members of the board of IEP's general partner, each rubber-stamped Icahn's decision to maintain dividends, quarter after quarter and, except Kekedjian, signed 10-Ks with the aforesaid deceptive or false statements and omissions. During their respective tenures, each participated in quarterly earnings conference calls and issued company press releases. ¶¶ 44-49.

Hence, all of IEP's CEOs and CFOs participated in the Dividend Inducement Scheme. Defendants other than Cozza and Cho participated in ballooning the valuation of the Automotive segment by over $1 Billion in Q3'21 and the delayed Auto Plus $226 million charge that should have been taken in 2022. Icahn, Willetts, and Papapostolou participated in the false denial campaign respecting the Hindenburg Report on May 4 and May 10, 2023, and doubled-down on the Dividend Inducement Scheme to prop up IEP's falling trading price by declaring yet another $2 per unit quarterly dividend on May 10, 2023, in the face of a U.S. Attorney's inquiry. ¶ 261.

A defendant's denial or denigration of a news article, such as the Hindenburg Report, confronting it with the truth supports a finding of severe recklessness sufficient to show *scienter*. In *Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d at 1359, the Court held Defendant:

> . . . should have suspected problems when *StockLemon.com* raised a significant red flag about S&J's accounting. However, instead of investigating when confronted with the article's allegations, Crowley himself flatly rejected them as "malicious comments" and "misstatements, mischaracterizations, and distortions." The fact

> that Crowley issued a denial indicates that he was either familiar with the facts or reckless in denying the allegations without sufficient knowledge of the situation.

The court found that defendant's "clear motive and opportunity to mislead investors creates sufficient severity" supporting recklessness, noting that defendant's stock holdings showed he "clearly had a large stake in keeping S&J's stock price inflated." *Id*.

As Board members, the Individual Defendants had actual knowledge of the Dividend Inducement Scheme used to buoy IEP's trading price. A reasonable inference arises that they knew about the $3.7 billion margin loan and related LTV linkage to unit price, the basis for Scheme. Their awareness that distributions were not set based on IEP's operating metrics, or liquidity, as falsely represented to investors (¶ 67), arose by reason of their participation in board meetings, earnings conference calls, and/or signing Forms 10-K. As corporate officers and directors, they had access to internal documents, information, and board discussions (¶ 49), their active, rubber-stamp participation in the Dividend Inducement Scheme was an egregious departure from ordinary standards of care, amounting to severe recklessness. Their participation in the Scheme resulted in a cycle of pumping IEP's trading price then dumping inflated units in a series of public offerings in order to pay heightened dividend pay-outs, evincing their *scienter*. *See In re PSS World Med. Inc. Sec. Litig*., 250 F. Supp. 2d at 1350; *In re Sunbeam*, 89 F. Supp. 2d at 1338-39; see *SEC v. Sugilight, Inc*., Case No. 6-02-CV-431-Orl-18KRS, 2002 U.S. Dist. LEXIS 22853, *9 (M.D. Fla. Oct. 15, 2002) (inference of *scienter* adequately pleaded on allegation defendant merely had knowledge of and participated in pump and dump scheme); a*ccord SEC v. Curshen*, 1888 F. Supp. 2d at 1307 ("pump and dump stock scheme is a classic violation" of Rule 10b-5(a) and (c)); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d at 1251; *In re World Access, Inc. Sec. Litig*., 119 F. Supp. 2d 1348, 1356 (N.D. Ga. 2000).

It is inconceivable that IEP's CFO's, Cho, Willetts, and Papapostolou, tasked with IEP's financial reporting, were unaware of the ongoing Dividend Inducement Scheme, with which they were complicit, materially impacting the Company's financial statements, particularly where they executed certifications, attesting to their accuracy, GAAP compliance, sufficiency of internal controls, and that there was no fraud present. *See, e.g., In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1344-47 (N.D. Ga. 2012); In re *Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1362-63 (N.D. Cal. 2005); *Sci.-Atlanta*, 239 F. Supp. 2d at 1365-66; *In re PainCare Holdings Sec. Litig.*, 541 F. Supp. 2d at 1291-93; *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d at 1349-51.

The refusal of Icahn and CEO/CFO/Co-Director Defendants to be transparent despite analyst criticism (Cozza and Cho as to UBS ¶ 8 and Papapostolou, and Willetts as to Hindenburg ¶¶ 259-260) – even falsely denying the truth – further demonstrates a purposeful intention to deceive, supporting *scienter*. The false denial of the truth in the wake of the Hindenburg Report and participating in another deceptive heightened dividend grant to further the illusion of sustainability in the wake of that Report and government investigation, further support a strong inference of scienter as to Icahn, Willetts, and Papapostolou. ¶ 254, 259-260, 267, 269-275, 415. *See Lickteig*, 589 F. Supp. at 326-327 (assurances and Defendants' unique access to information created issue of fact about use of non-GAAP figures). An inference of *scienter* respecting each CEO and CFO (each also co-directors) is supported by their motive and opportunity to inflate IEP's unit trading price as IEP engaged a series of at-the-market offerings, reaping over $1.7 billion in cash infusions. ¶ 399-402.

Defendants rely on cases that are readily distinguishable. For example, Defendants rely on *Underwood v Lampert*, CASE NO. 02-21154-CIV-ALTONAGA/ Bandstra, 2004 WL 7332754 *15 (S.D. Fla. Aug. 30, 2004) (MTD at 21) where the court found as "too speculative" the failure

of a business partner on then-existing mixed facts. But the court in *Underwood* also found that, once the facts had developed, "Concord knew KB's business was in decline, knew KB's accounts receivable was increasing, and knew the primary sales period for the JamCams had ended. According to the allegations, ***it must have been obvious to Concord*** that by including its accounts receivables in the January Press Release, without specifying that almost $16 million of those receivables represented an unsecured and delinquent balance from one customer, ***there was a danger of misleading*** buyers and sellers." *Id.* Indeed, the *Underwood* court also determined that a "possible deviation" from GAAP may be considered as additional evidence of scienter. *Id.* at *16. Thus, *Underwood* tends to support Plaintiffs' case more than it supports Defendants'. Similarly, Defendants' reliance on *In re Williams Sec. Litig.,* 339 F.Supp.2d 1242 (N.D. Okla. 2003), is misplaced. There, the court sustained plaintiffs' complaint because it sufficiently identified the misleading statements or omitted material facts and sufficiently pled scienter. Indeed, as *Williams* holds, here Defendants were required to disclose that Icahn' margin loan LTV ratios were linked to unit price, that any de-linkage created a material risk to payment of the dividend at current levels, that INAVs were used to mislead the market about the Company's results of operations, especially with Auto, and that the dividend was not sustainable on ordinary operations; in other words, "they are required to disclose material facts which are known at the time of the preparation of [the] disclosure documents." *Id.*, 339 F. Supp. 2d at 1263.

Defendants also miss the mark by arguing that *Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, Case No. 3:18-cv-771-J-34JRK, 2019 WL 1429667 (M.D. Fla. March 29, 2019), protects them, contending that they could not have predicted that Icahn would restructure his margin loan LTV ratios. MTD at 21. Plaintiffs don't allege that Defendants

42

failed to predict LTV de-linkage; on the contrary, Plaintiffs allege Defendants *concealed* the nature of the LTV ratios and the material risk LTV de-linkage posed to dividend grants. See ¶¶ 6, 269.

Defendants' piecemeal attack on the allegations of a strong inference of *scienter* regarding the Individual Defendants, and the corporate entities to which their *scienter* is imputed, lacks merit. Viewed *holistically* and collectively, the factual allegations and all inferences therefrom plead a strong inference of *scienter* at least as cogent and compelling as any competing inference.

### E.    Plaintiffs Adequately Plead Loss Causation

To show loss causation, "a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Luczak*, 812 Fed. Appx. at 920-21. Loss causation can be demonstrated by: (1) identifying a "corrective disclosure" (a release of information revealing the pertinent truth that was fraudulently concealed or obscured); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for the price drop, so the factfinder can infer that it is more probable than not that the corrective disclosure—as opposed to other possible depressive factors—caused at least a "substantial" amount of the price drop. "[P]laintiff need not show that the defendant's misconduct was the sole and exclusive cause of his injury; he need only show that the defendant's act was a substantial or significant contributing cause." *Id.* (*quoting FindWhat*, 658 F.3d at 1309 *Robbins v. Koger Prop., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997))). Plaintiff need only provide "some indication of the loss and the causal connection that [it] has in mind[,]" a "simple test" not meant to "impose a great burden upon a plaintiff" and there is not "any special further requirement" for pleading loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).

In a fraud-on-the-market case, plaintiffs often demonstrate loss causation circumstantially, identifying a "corrective disclosure" and "showing that the stock price dropped soon after the

corrective disclosure." *Bush*, 2023 WL 8263037, *5, *10 (finding that a short seller report was corrective), citing *FindWhat*, 658 F.3d at 1311. A corrective disclosure "can come from any source and can take any form from which the market can absorb the information and react . . ., so long as it reveal[s] to the market the falsity of the prior misstatements." *Id.* at 1311 n. 28.[8]

Plaintiffs allege IEP traded at artificially inflated prices until a series of partial corrective disclosures revealed the Dividend Inducement Scheme. *See, e.g.,* ¶¶ 6-7, 9, 16-17, 25-26, 29-31. As allowed by *Dura*, Plaintiffs identify a series of corrective disclosures on May 2, May 10, and August 4, 2023. *Dura*, 544 U.S. at 342-43. *Luczak* requires the plaintiff to "state facts that show (1) those disclosures gradually revealed to the market the undisclosed truth about [defendant's fraud], and (2) such disclosures resulted in the decline of [defendant's] share price." 812 Fed. Appx. at 921, (*citing Meyer*, 710 F.3d at 1197). Plaintiffs do so here.

Defendants' reliance on *Meyer v. Greene* and its progeny to contend there was no new information contained in the Hindenburg Report or in the disclosure of the U.S Attorney investigation is misplaced. While *Meyer* and other decisions in this circuit require new information to be set forth in an alleged corrective revelation and have, at times, rejected short seller reports as corrective disclosures on that basis, here, Plaintiffs allege sufficiently that the corrective revelations of May 2, May 10, and August 4, 2023, each provided new information related to "the issues involved in the alleged fraudulent scheme." *Cf., In re: Teco Energy Inc., Sec. Litig.*, 2006 WL 845161, *4-5 (M.D. Fla. Mar. 30, 2006).

---

[8] Loss causation can also be pled under a "**materialization of the risk**" theory by showing that defendant's actions concealed a foreseeable risk that ultimately materialized, harming shareholders. *See, e.g., Beckel v. Fagron Holding USA, LLC*, 2019 WL 5110828, at *8 (M.D. Fla. June 24, 2019); *Flowers*, 2018 WL 1558558, at *18. Plaintiffs allege the August 3, 2024, corrective disclosure of the dividend cut from $2 to $1, represented a materialization of the LTV de-linkage risk that had been concealed throughout the Class Period. ¶¶ 379-380.

The first partial corrective disclosure was the Hindenburg Report, which identified numerous problems camouflaged by the Company's lack of transparency, including over-valuation of assets, and concluded, based on its analysis, that IEP could not sustain the $2 per unit per quarter dividend going forward. ¶ 19; *see also* ¶¶ 20-24, ¶¶ 250-58. As stated in the Report:

- **Adding to evidence of IEP's unsustainability, we estimate that IEP's last reported indicative year-end NAV of $5.6 billion is inflated by at least 22%, due to a combination of overly aggressive marks on IEP's less liquid/private investments and continued year to date underperformance.**

- **Overall, we estimate IEP's current NAV as being closer to $4.4 billion, or 22% lower than its disclosed year-end indicative NAV of $5.6 billion. The analysis suggests that units currently trade at a 310% premium to NAV, with an annual dividend rate of 64% of NAV.**

- Further underscoring Icahn's limited financial flexibility, he has pledged 181.4 million units, ~60% of his IEP holdings, for personal margin loans. Margin loans are a risky form of debt often reliant on high share (or unit) prices. Icahn has not disclosed basic metrics around his margin loans like loan to value (LTV), maintenance thresholds, principal amount, or interest rates. We think unitholders deserve this information in order to understand the risk of margin calls should IEP unit prices revert toward NAV, a reality we see as inevitable.

¶¶ 250(n), (u), (2)-(aa).

The Report noted the lack of transparency regarding Icahn's personal debt, for which he had pledged 60% of his IEP holdings as collateral. ¶ 251. It further identified for the market that investors had never been given, nor had Defendants timely or adequately disclosed, material information and metrics such as LTV ratios, maintenance thresholds, principal amount of his personal loan, and interest rates, which were essential to fully and adequately inform the market of the risks arising from the Icahn's margin loans and associated LTV de-linkage risk. ¶ 252. As the Report stated: "*unitholders deserve this information in order to understand the risk of margin calls should IEP unit prices revert toward NAV, a reality we see as inevitable.*" ¶ 252. On this disclosure, IEP's unit price fell $10.06, or 20%, to close at $40.36 on May 2, 2023; a statistically

45

significant decline after controlling for movements in the overall market (S&P 500) and in the industry sector (YFINLX Index). ¶¶ 254, 376.

Plaintiffs plead that Icahn and IEP issued statements in response to the Hindenburg Report, to "reassure" investors that the Report did not impact the Company's liquidity and to announce a $2.00 dividend for the quarter. ¶¶ 258-260 (alleging Defendants' "campaign to halt and reverse the stock price decline" from the Hindenburg Report); ¶¶ 267-78 (alleging Defendants' "full-fledged damage control" to "buoy" the trading price of IEP). Defendants' reaction to the Hindenburg Report, which was intended to blunt the Report's impact on the market, is further confirmation that the Hindenburg Report presented new information to the market. ¶ 267. Indeed, in their statements from April 2 to April 10, 2023, Defendants (1) bolstered the Dividend Inducement Scheme by doubling down on IEP's false narrative about INAVs; (2) concealed potential margin calls respecting Icahn's personal margin debt in the event of declining unit prices, or because the trading price of IEP units was linked to covenants respecting Icahn's personal debt; (3) concealed the risk that LTV de-linkage would occasion an adverse impact on the amount of dividends; and (4) failed to disclose the deceptive manner in which INAVs were presented to the market. ¶ 269. These statements continued to deceive the market and buoy the price of IEP units, at least until the Company's own August 3, 2023, additional corrective disclosure. ¶ 270.

The second partial corrective disclosure was the May 10, 2023, disclosure that the U.S. Attorney's office for the Southern District of New York had contacted IEP *the day after publication of the Hindenburg Report*, seeking production of information relating to the Company, certain of its affiliates' "corporate governance, capitalization, securities offerings, dividends, valuation, marketing materials, due diligence and other materials." ¶ 263. IEP also reported a $226 million charge related to Auto Plus. ¶ 264. These disclosures partially revealed

46

that the Company's INAV's were inflated, while successfully maintaining some artificial inflation in the price of IEP units. ¶¶ 267-75. IEP's unit price declined $5.75 per share, or 15.1%, to close at $32.22 per share on May 10, 2023, a statistically significant decline after controlling for the overall market and the industry sector. ¶ 378.[9]

The final alleged corrective disclosure was the Second Quarter 2023 Press Release. ¶¶ 285-92. Having renegotiated his personal debt, untethering it from IEP's trading price, Icahn ended the Dividend Inducement Scheme, declaring a $1.00 distribution for the second quarter, the lowest distribution in more than ten years. IEP also disclosed a second quarter 2023 net loss including a onetime $116 million loss related to a loan receivable from Auto Plus relating to its bankruptcy. ¶ 379. On this news, the trading price of IEP units fell from $32.68 on August 3, 2023, to $25.09 on August 4, 2023, on historic volume of over 11,282,300 units. This decline was statistically significant after controlling for movements in the overall market and in the industry sector. ¶ 380.

Plaintiffs allege that each of these corrective revelations relate to, and corrected, the Dividend Inducement Scheme and Defendants' prior misstatements, material omissions, and inflated financial statements. *See, e.g.,* ¶¶ 92, 135, 165, 210, and 249. The Hindenburg Report alerted the market for the first time that (a) Icahn's personal loans had LTV ratios that carried a previously unknown risk to the payment of the dividend at current levels, (b) the Company's INAVs were inflated, and (c) the dividend was unsustainable at current levels. The May 10 disclosures specifically identified "valuation," "securities offerings" and "dividends" as subjects

---

[9] Plaintiffs' allegations that Defendants issued statements to the market to rebut or contradict the Hindenburg Report (¶¶258-60, 267-78) are pertinent because "[f]raudulent statements that *prevent* a stock price from falling can cause harm by *prolonging* the period during which the stock is traded at inflated prices." *FindWhat*, 658 F.3d at 1314 (original emphasis). Defendants can be liable for "causing a stock price to *remain* inflated by preventing preexisting inflation from dissipating from the stock price." *Id.*, 658 F.3d at 1315 (original emphasis).

the U.S. Attorney was investigating (¶ 263), and the $226 million charge related to the Auto Plus valuation of the Automotive Segment. ¶ 264. Finally, the August 4 halving of the dividend marked the end of the Dividend Inducement Scheme at the heart of Plaintiffs' pleading and was the subject of the Hindenburg Report. ¶¶ 285-93. Each of the corrective disclosures triggered statistically significant stock price declines after controlling for stock price movement attributable to the overall market and the industry in which IEP exists (¶¶ 376, 378, 380), thereby satisfying the pleading requirement for loss causation. As the Court of Appeals has explained, "People who buy the stock after the [fraudulent] announcement, and before the truth comes out, pay too much; they will lose money when the [concealed] bad news emerges." *FindWhat*, 658 F.3d at 1316.

Finally, Defendants erroneously rely on *MiMedx* to argue that all of the alleged new corrective information was in fact already disclosed to the market and the Hindenburg Report was merely one analyst's opinion. MTD at 46-47. But in *MiMedx*, the Eleventh Circuit established that a corrective disclosure **can** be demonstrated where the new adverse information therein subsequently becomes reported in adverse results at the company, as happened here. *See MiMedx*, 73 F.4th at 1247-48. Here, Plaintiffs allege charges and a bankruptcy related to the Company's Auto Segment, reported on May 10, 2023, and the reduction of the dividend, reported on August 4, 2023, coupled with actual changes in the key covenants related to the LTV ratios of Icahn's personal loans (¶¶ 287-290) – all of which underscore that the earlier revelations on May 2 and May 10, 2023, including the Hindenburg Report and the U.S. Attorney investigation, are corrective and revealed new information. The new information in the Report included (a) IEP's INAVs were inflated, (b) LTV de-linkage threatened dividends, and (c) the dividend was unsustainable, none of which was previously disclosed. The Hindenburg Report did not merely "change investor expectations" with its "opinion" based on known facts. *Cf.*, *MiMedx*, 73 F.4th at 1246; *Meyer*, 710

48

F.3d at 1200. Rather, the Hindenburg Report presented compelling new information that INAVs were inflated and the dividend was at risk, which new information was thereafter corroborated by the later disclosures of the Auto segment write-down, IEP's slashed dividend, and changes to the LTV covenants on Icahn's personal margin loans.

### F.        Plaintiffs Adequately Plead Control Person Liability

Under Section 20(a) of the Exchange Act, a "controlling person" is "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a).

> . . . a defendant is liable as a controlling person under [S]ection 20(a) if he or she had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.

*Brown v. Enstar Grp., Inc*., 84 F.3d 393, 396 (11th Cir. 1996). The viability of a Section 20(a) claim is dependent on the successful pleading of a primary violation under Section 10(b) of the Exchange Act. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Here Plaintiffs have sufficiently alleged that the Individual Defendants, by virtue of their high-level positions, participated in, or were aware of, Defendants' false and misleading statements, and had the power to influence and control and did influence and control, the decision making of IEP, including the content and dissemination of the various statements that are the subject of this dispute. Plaintiffs further allege that the Individual Defendants had direct and supervisory involvement in the day-to-day operations of IEP and, the power to control or influence the particular statements giving rise to the alleged securities violations. ¶ 435. Thus, Section 20(a) liability is adequately pled. *See In re PSS World Med., Inc. Sec. Litig*., 250 F. Supp. 2d at 1351 (citing Brown, 84 F.3d at 396–97).

## IV.     CONCLUSION

For the reasons set forth herein, Defendants' motion should be denied in its entirety. Should the Court grant any portion of Defendants' motion, Plaintiffs request that such an order be without prejudice

## REQUEST FOR HEARING

Pursuant to L. R. 7.1(b)(2), Plaintiffs respectfully request a hearing on this Motion. Plaintiffs believe a hearing would be helpful given the complexity of the underlying issues, allegations, and factual timeline involved in this matter and will assist the Court in adjudicating the Motion. Plaintiffs estimate that sixty (60) minutes will be sufficient.

Dated: April 11, 2024                                  Respectfully submitted,


**By:** */s/ Howard M. Bushman*
ADAM MOSKOWITZ (Fla. Bar No. 984280)
HOWARD M. BUSHMAN (Fla. Bar No. 364230)
BARBARA C. LEWIS (Florida Bar No. 118114)
Email: adam@moskowitz-law.com
Email: howard@moskowitz-law.com
Email: barbara@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175

*Liaison Counsel*

JEFFREY W. GOLAN
EMAIL: jgolan@barrack.com
JEFFREY A. BARRACK*
EMAIL: jbarrack@barrack.com
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963–0600
Facsimile: (215) 963–0838

STEPHEN R. BASSER*
EMAIL: sbasser@barrack.com
SAMUEL M. WARD*
EMAIL: sward@barrack.com
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900

51

San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

*Lead Counsel for Lead Plaintiffs and the Putative
Class*

*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2024, I served a true and correct copy of the foregoing

upon all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Howard M. Bushman
*Howard M. Bushman*

52