**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:23-cv-21773-KMM**

PHILIP KOSOWSKY and GARY COTON,
individually and on behalf of all others
similarly situated,

$\qquad$ Plaintiffs,

$\qquad$ v.

ICAHN ENTERPRISES L.P., ICAHN
ENTERPRISES HOLDINGS L.P., ICAHN
ENTERPRISES G.P. INC., CARL C. ICAHN,
ARIS KEKEDJIAN, DAVID WILLETTS,
TED PAPAPOSTOLOU, KEITH COZZA,
and SUNGHWAN CHO,

$\qquad$ Defendants.

**DEFENDANTS' REPLY IN SUPPORT OF THE MOTION**
**TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................................iii

PRELIMINARY STATEMENT.......................................................................................................... 1

ARGUMENT ...................................................................................................................................... 6

   I.     Plaintiffs Fail to Plead a Material Misstatement or Omission ............................................. 6

      A.    Plaintiffs' Complaint Is Based Upon a Misinterpretation of the Law ......................... 6

      B.    Plaintiffs Fail to Plead with Particularity.................................................................... 7

      C.    Plaintiffs Fail to Plead Any Claim Based on Mr. Icahn's Personal Loans ................... 7

      D.    Plaintiffs Fail to Plead Any Misstatement or Omission Regarding Distributions........ 8

      E.    Plaintiffs Fail to Plead Any Misstatement or Omission Based on the Alleged
          Dividend Inducement Scheme ................................................................................... 10

      F.    Plaintiffs' Misrepresentation Theory Regarding the ATM Offerings Fails ................11

      G.    Plaintiffs Fail to Allege Misstatements or Omissions Based on Indicative NAV....... 12

      H.    Plaintiffs Fail to Allege GAAP Violations for IEP's Automotive Segment................ 12

   II.    Plaintiffs Fail to Allege an Actionable Scheme............................................................... 14

      A.    Plaintiffs' Scheme Liability Claim Violates Pleading Rules ..................................... 14

      B.    Plaintiffs Fail to Plead a Claim for Scheme Liability................................................ 15

   III.   Plaintiffs Fail to Plead Scienter ...................................................................................... 17

      A.    Plaintiffs Fail to Plead Scienter with Particularity as to Any Individual Defendant .. 17

      B.    Plaintiffs' Efforts to Avoid Pleading as to Each Individual Defendant Fail ............... 21

      C.    Plaintiffs Fail to Plead Scienter for Mr. Icahn ......................................................... 22

      D.    Plaintiffs' Remaining Scienter Allegations Fail ....................................................... 24

   IV.   Plaintiffs Fail to Adequately Plead Loss Causation ....................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
606 F.2d 602 (5th Cir. 1979) ...............................................................................7, 11, 16

*Bush v. Blink Charging Company*,
2023 WL 8263037 (S.D. Fla. Nov. 27, 2023)...........................................................25

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..................................................................................6

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*,
856 F. 3d 605 (9th Cir. 2017) ...................................................................................14

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
649 F. Supp. 3d 1256 (S.D. Fla. 2023) .................................................................20, 21

*Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*,
219 F.3d 1301 (11th Cir. 2000) ................................................................................13

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020).......................................................................10

*In re Dynergy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) .......................................................................23

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
594 F.3d 783 (11th Cir. 2010) ..................................................................................10

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d. Cir. 2011)......................................................................................14

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ..........................................................10

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..............................................................................7, 24

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).........................................................21

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
157 F. Supp. 3d 1230 (N.D. Ga. 2015).................................................................15, 16

iii

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
   843 F.3d 1257 (11th Cir. 2016) ...........................................................................................17

*Gnanaraj v. Lillium*,
   2023 WL 9064669 (S.D. Fla. Dec. 18, 2023) .......................................................................15

*Gomez v. Miami-Dade Cnty.*,
   563 F. Supp. 3d 1211 (S.D. Fla. 2021) .................................................................................13

*Hennington v. ADT Corporation*,
   161 F. Supp. 3d 1161 (S.D. Fla. 2015) .................................................................................16

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
   660 F. App'x 850 (11th Cir. 2016) ........................................................................7, 11, 15, 16

*Jackson v. Microchip Tech. Inc.*,
   2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ........................................................................12

*Macquarie Infrastructure Corp. v. Moab Partners L.P.*,
   601 U.S. 257 (2024) ............................................................................................................6, 9

*Malin v. Ivax Corp.*,
   17 F. Supp. 2d 1345 (S.D. Fla. 1998) ...................................................................................23

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
   2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) .......................................................................14

*Meyer v. Green*,
   710 F.3d 1189 (11th Cir. 2013) ............................................................................................25

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) .................................................................................18, 20, 22

*Newman v. L.F. Rothschild, Unterberg, Towbin*,
   651 F. Supp. 160 (S.D.N.Y. 1986) .........................................................................................8

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*
   2023 WL 1800963 (D. Ariz. Feb. 7, 2023)...........................................................................11

*Ramirez v. Exxon Mobil Corp.*,
   334 F. Supp. 3d 832 (N.D. Tex 2018) ...................................................................................14

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015) .................................................................................22

*Robbins v. Koger Properties, Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ............................................................................................25

*S.E.C. v. Curshen*,
  888 F. Supp. 2d 1299 (S.D. Fla. 2012) ........................................................................17

*S.E.C. v. Merch. Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ....................................................................................10

*Sapssov v. Health Mgmt. Assocs., Inc.*,
  608 F. App'x 855 (11th Cir. 2015) ..............................................................................25

*In re Sci. Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010) ........................................................................21

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) ........................................................................14

*In re Spear & Jackson Sec. Litig.*,
  399 F. Supp.2d 1350 (S.D. Fla. 2005) .........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).....................................................................................................18

*Theodore v. PureCycle Technologies*,
  2023 WL 4035880 (M.D. Fla. June 15, 2023)..............................................................24

*In re Tupperware Brands Corp. Sec. Litig.*,
  2023 WL 5091802 (11th Cir. Aug. 8, 2023)...........................................................14, 15

*In re Tupperware Brands Corp. Sec. Litig.*,
  2022 WL 354517 (M.D. Fla. Feb. 4, 2022) ..................................................................15

*In re Tupperware Brands Corp. Sec. Litig.*,
  2021 WL 247870 (M.D. Fla. Jan 25, 2021)..................................................................15

*United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake
  Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) .................................................................................2, 8

*Weiland v. Palm Beach County Sheriff's Office*,
  792 F.3d 1313 (11th Cir. 2015) ...................................................................................15

*In re Zagg, Inc. Sec. Litig.*,
  797 F.3d 1194 (10th Cir. 2015) ...................................................................................20

*Zerman v. Ball*,
  735 F.2d 15 (2d Cir. 1984)............................................................................................8

**Statutes**

15 U.S.C. § 78n(d)(2) ...........................................................................................................10

15 U.S.C. § 78u–4(b)(1)(B) ................................................................................................................7

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................................17

**Other Authorities**

12 C.F.R. § 220.12 ............................................................................................................................3

**PRELIMINARY STATEMENT**

In their Opposition to Defendants' Motion to Dismiss ("Opposition" or "Opp."), Plaintiffs

summarize the alleged scheme as follows:

> The deceptive conduct challenged by the Plaintiffs' Scheme allegations includes:
> (1) raising dividends to $1.75, then $2, and maintaining unsustainable heightened
> dividends despite inconsistent liquidity and financial metrics in order to inflate IEP
> trading prices (¶ 32); (2) concealing the LTV linkage to unit price of Icahn's margin
> loans in the undisclosed amount of $3.7 billion (¶ 68); (3) using heightened
> dividends to buoy IEP's trading price enough to shelter Icahn from a margin call
> that would threaten his control of IEP (¶ 69); (4) issuing at-the-market public
> offerings securing more than $1.7 billion to fund the cash dividend distributions,
> effectively "pumping" the unit prices and "dumping" inflated units on investors
> (¶ 400); (5) manipulating asset valuations (¶¶ 295-317); and (5) delaying a $226
> million charge for Auto Plus until after completion of the last offering (¶ 248).

Opp. at 11-12.

All of these allegations are components of Plaintiffs' so-called "Dividend Inducement

Scheme." The fundamental flaw with Plaintiffs' claim is that for there to be a fraud or a scheme

to defraud, there must be some deception, misleading statement, or actionable failure to disclose.

In this case, all of the facts underlying Plaintiffs' claim were fully disclosed in IEP's public filings:

- Plaintiffs claim that IEP declared $2 distributions that were not supported by its
  financial performance. But as the Complaint repeatedly sets forth, each quarter
  when IEP announced its distribution, it also disclosed in exhaustive detail its
  financial performance. For most quarters during the putative class period, IEP's
  reported performance was not good. Accordingly, the supposed disconnect
  between the size of IEP's distributions and its financial performance was fully
  disclosed to investors, completely undermining any claim of deception.

- It is also simply false that IEP did not have the liquidity to support its distributions.
  For every quarter during the alleged class period, IEP disclosed in its public filings,

1

on which Plaintiffs rely, that it had between $925 million and $3.3 billion in cash, always many multiples more cash than was needed to fund the distributions. Defendants' Motion to Dismiss ("Motion" or Mot.") (ECF No. 97) at 8-9.

- Plaintiffs claim repeatedly that the linkage between Mr. Icahn's personal margin loans and the trading price of IEP's units was withheld from investors. This is patently false. IEP's Form 10-Ks, on which Plaintiffs rely, explicitly stated that "the number of depositary units pledged to secure [Mr. Icahn's] loans fluctuates . . . as a result of changes in . . . the market price of the depositary units." *See* Ex. 22, 2021 10-K at 125 & 126 n.(c); Ex. 1, 2022 10-K at 124 & n.(c). Plaintiffs completely ignore these disclosures in their Opposition. They also avoid the caselaw cited by Defendants explaining that the obvious manner in which a margin loan works—*i.e.*, when the value of the pledged securities drops there may well be a margin call—is information "so basic that any investor could be expected to know it." Mot. at 16-18. Indeed, in a case dismissing a claim alleging failure to disclose the risk of a margin call that Plaintiffs ignore, the Tenth Circuit held that "[t]he risk of margin calls and the consequent need of the owner of the stock to sell shares is obvious." *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1241 (10th Cir. 2014).

- Plaintiffs claim that IEP's "at the market" ("ATM") offerings were part of the Dividend Inducement Scheme because the offerings were used to fund IEP distributions, rather than IEP's operations. But once again, this claim fails because there was no deception or withholding of information. Every time IEP did an ATM offering, it disclosed the offering in a 10-K or Q, including how much money was

raised and when.  In those same quarterly filings it also disclosed the financial results of its operations.  The thrust of the federal securities laws is disclosure. When the material facts are disclosed, as they were here, there can be no claim.

- Plaintiffs allege that the size of Mr. Icahn's personal indebtedness was withheld from investors as part of the scheme.  However, the 2021 10-K on which Plaintiffs rely disclosed that Mr. Icahn had pledged 167,658,659 units, which at the date of disclosure had a market value of $9,072,010,038.  Ex. 22, 2021 10-K at 125 & 126 n.(c).  The 2022 10-K disclosed that Mr. Icahn had pledged 181,439,167 units, which at the date of disclosure had a market value of $9,777,756,709.  Ex. 1, 2022 10-K at 124 & n.(c).  In other words, IEP disclosed Mr. Icahn pledged more than $9.7 billion in IEP units to secure his personal loans, thereby informing the market that his loans were in the multiple billions.  *See* 12 C.F.R. § 220.12 (providing that an initial margin loan can be 50% of the pledged securities).

- Plaintiffs claim Mr. Icahn nearly always took his quarterly distributions in IEP units, not cash, in order to reduce the amount of cash IEP would need to pay out in distributions and increase the number of units Mr. Icahn had available to pledge. But once again, none of this was part of any fraud because all of it was fully disclosed.  Every time Mr. Icahn took his distributions in units, IEP disclosed that fact in its SEC filings.  *See*, *e.g.*, Ex. 1, 2022 10-K at 44.

- Plaintiffs claim IEP suggested to the market that its $2 distribution would continue in perpetuity.  This claim, too, is flatly contradicted by the public disclosures IEP made every quarter, in which it warned that distributions could be reduced at any time and for multiple reasons.  *See*, *e.g.*, Ex. 1, 2022 10-K at 16.

3

- Plaintiffs claim IEP completed the scheme when it reduced the distribution to $1 after Mr. Icahn's loans were no longer linked to the trading price of IEP units because he no longer had a reason to prop up the price of the units. This assertion is contradicted by IEP's public disclosures and by Plaintiffs' own calculations. In their Complaint, Plaintiffs explained that IEP's distribution yield averaged approximately 14% during the class period, which Plaintiffs claim was excessive. ¶¶ 295-98. In their Motion, Defendants used the exact same calculations and public disclosures to show that the $1 reduction in IEP's distribution simply maintained the same approximate historical yield, rather than increasing the yield to an unprecedented 25% if the distribution had remained at $2. Mot. at 12.

- Plaintiffs claim that IEP inflated its Indicative NAV calculations to levels higher than GAAP to prop up the trading price of its units, thereby staving off a margin call to Mr. Icahn. This allegation also fails because, once again, IEP publicly disclosed the relevant information, including the methods by which it arrived at Indicative NAV calculations, that those calculations were inherently subjective, and that others may disagree with the methods used. Each of IEP's contemporaneous GAAP disclosures also made clear Indicative NAV was higher than GAAP. Plaintiffs do not allege IEP did not follow the NAV methodology it disclosed. Rather, they take issue with the methodology. Such a difference of opinion about subjective disclosures cannot form the basis of a claim.

- Plaintiffs allege that IEP delayed a $226 million charge in connection with the Auto Plus bankruptcy by one quarter. That bankruptcy was publicly disclosed in January 2023 and IEP disclosed in February 2023 that it expected a write down as a result.

4

IEP then disclosed the size of that write down in its Q1 2023 filing. Plaintiffs claim IEP should have disclosed the write down one quarter earlier but have provided no particularized facts showing that IEP knew about or could have calculated the write down by December 2022. In any event, such a disagreement about a short delay in an accounting charge cannot form the basis for a claim.

Stripped of Plaintiffs' hyperbole, the only aspect of the alleged scheme that was not disclosed were Defendants' purported motivations, *i.e.*, that Defendants allegedly chose to pay $2 quarterly distributions to drive up the price of IEP units, protect Mr. Icahn from a margin call, and ensure that Mr. Icahn maintained control over IEP. But Plaintiffs have fabricated this motivation out of whole cloth. There is simply no document, statement, public filing, confidential witness, or particularized fact showing that was Defendants' motivation. More importantly, it makes no sense. IEP's 2022 10-K disclosed that Mr. Icahn had pledged 181,439,167 units out of a total 299,997,624 that he owned and a total 353,572,182 outstanding. Ex. 1, 2022 10-K at 55, 124 & n.(c). Accordingly, he had 30,165,411 units remaining to satisfy any margin call while still ensuring control of the Company.[1] In that same 10-K, IEP disclosed that Mr. Icahn personally owned an additional $4.9 billion in interests in the investment funds managed by IEP. *Id.* at 35. He therefore also had that $4.9 billion available to satisfy his personal loans. This cushion demonstrates that none of the Defendants had any motivation to engage in any scheme to protect Mr. Icahn from a

---

[1] Under IEP's Partnership Agreement, the general partner that controls IEP—which is owned entirely by Mr. Icahn—can be removed only if IEP record holders owning at least 75% of the total IEP units voted it out. Ex. 7, IEP Partnership Agreement § 12.02(a). Thus, so long as Mr. Icahn continued to own more than 25% of IEP's outstanding units, he could not lose control.

margin call that he could readily meet, let alone the near impossibility that he could lose control of IEP. Finally, in any event, the law is clear that motivations are irrelevant when the facts are disclosed.

For the reasons set forth in Defendants' Motion to Dismiss and below, the Complaint should be dismissed in its entirety and with prejudice.

**ARGUMENT**

**I.      PLAINTIFFS FAIL TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION**

        **A.      Plaintiffs' Complaint Is Based Upon a Misinterpretation of the Law**

To state a claim, Plaintiffs must establish that there has been a material misstatement or omission. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). Here, Plaintiffs largely rely upon purported omissions. *See*, *e.g.*, ¶¶ 92, 135. But as the Supreme Court confirmed just last month, companies have no duty to disclose every potentially material fact. *Macquarie Infrastructure Corp. v. Moab Partners L.P.*, 601 U.S. 257, 265 (2024). Rather, they must disclose only information "necessary" to ensure that the statements that were made are not misleading. *Id.* at 264. As such, "revealing one fact" about a topic does not mean that an issuer must reveal all other information regarding that topic. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).

Here, as detailed above, Defendants disclosed all of the essential facts that were part of the purported scheme. Plaintiffs cannot establish that Defendants had a duty to disclose more without demonstrating Defendants made a statement that was false or misleading. This, they fail to do.

Moreover, Plaintiffs cannot recover on the theory that Defendants should have disclosed their purported "true" motivations. Even assuming Defendants had the motivations Plaintiffs have fabricated, where, as here, a company accurately describes a transaction, it has no duty to disclose additional details concerning its motivations. *See IBEW Local 595 Pension & Money Purchase*

6

*Pension Plans v. ADT Corp.*, 660 F. App'x 850, 859 (11th Cir. 2016); *Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 608 (5th Cir. 1979).  Plaintiffs do not even try to distinguish these cases, because they cannot.

Finally, Plaintiffs cannot rely upon Jefferies' "dividend[s] . . . 'into perpetuity'" assumption to argue that Defendants had a duty to disclose additional information.  Opp. at 18-19.  Plaintiffs do not cite a single case holding that a company has a duty to correct statements made by analysts.  Moreover, IEP repeatedly warned investors that future distributions could change.  Mot. at 6-7.

### B.  Plaintiffs Fail to Plead with Particularity

As Plaintiffs acknowledge, the Complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B); Opp. at 15.  As detailed in the Motion, Plaintiffs fail to satisfy this standard and simply excerpt long sections of IEP's disclosures.  Mot. at 15-16 (citing cases).  Unsurprisingly, Plaintiffs fail to cite cases establishing that they have pleaded with specificity.  The primary case Plaintiffs cite, *Murray v. Earthlink Holdings Corp.*, involved claims that were *not* subject to the PSLRA.  2023 WL 4295600, at *4 (E.D. Ark. June 30, 2023); *see also* Opp. at 16, 26.

### C.  Plaintiffs Fail to Plead Any Claim Based on Mr. Icahn's Personal Loans

Plaintiffs fail to state a claim based upon IEP's purported failure to disclose that the loan-to-value ratios in Mr. Icahn's margin loans were connected to IEP's unit trading price or that such connection created the risk of a margin call.  As Defendants' Motion demonstrated, the theory fails because IEP disclosed (a) the number of IEP units pledged to support Mr. Icahn's loans, which units had a value of as much as $9.7 billion, and (b) that "[t]he number of depositary units [Mr. Icahn] pledged to secure these loans fluctuates . . . as a result of changes … [in] the market price of the depositary units."  Mot. at 16-18; *see* Ex. 22, 2021 10-K at 125 & 126 n.(c); Ex. 1, 2022 10-

7

K at 124 & n.(c).  Plaintiffs simply ignore these disclosures in their Opposition because they have no answer to them.  In addition, Defendants had no duty to disclose more.

Plaintiffs do not cite a single case holding that a company has a duty to disclose the specific terms of a margin loan.  The best Plaintiffs do is argue that two cases Defendants cited, *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160 (S.D.N.Y. 1986) and *Zerman v. Ball*, 735 F.2d 15 (2d Cir. 1984), involved claims against brokers.  Opp. at 26 n.6.  But this fact is irrelevant to both courts' holdings that the operation of a margin loan is "so basic that any investor could be expected to know it."  *Zerman*, 735 F.2d at 21; *see also Newman*, 651 F. Supp. at 164.  Moreover, Plaintiffs completely ignore *United Food*, which Defendants discussed at length in their Motion, and which did involve a claim against an issuer.  Mot. at 17-18.  In that case, plaintiffs alleged that while the issuer disclosed that the CEO held his company securities on margin, the omission of details about those loans was misleading.  The Tenth Circuit affirmed dismissal of the complaint, holding that risks and details of margin loans need not be disclosed because they are well known.  *United Food*, 774 F.3d at 1241-42 ("'[i]t is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market.'") (quoting *Newman,* 651 F. Supp. at 164).

## D.    Plaintiffs Fail to Plead Any Misstatement or Omission Regarding Distributions

Plaintiffs repeatedly argue that IEP's $2 distribution was part of the fraud because it was unsustainable and unsupported by IEP's financial performance, and because IEP suggested it would continue in perpetuity.  These claims fail because IEP repeatedly warned investors in its public filings that the distribution might be reduced or eliminated at any time and IEP fully disclosed its financial performance every time it announced each distribution.

Plaintiffs assert over and over that IEP's $2 distribution was excessive in light of IEP's financial performance.  In both their Complaint and Opposition, Plaintiffs quote at length IEP's public disclosures about its poor and inconsistent financial performance.  And they spend pages and pages providing myriad calculations explaining how outsized the distribution was compared to other companies.  But what Plaintiffs ignore is that, in so doing, they demonstrate that IEP disclosed *all* of this information—both about its performance and about the size of the distributions.  Armed with this information, investors were free to make a choice whether to invest. That is all the securities laws require.

Plaintiffs attempt to save their claim by asserting that Defendants made misleading statements about future distributions.  But Plaintiffs do not identify a single false or misleading statement or a case supporting their position.[2]  They do not and cannot dispute that IEP's statements about its history of paying distributions are accurate statements of historical fact that are not actionable.  Mot. at 21.  In the background section of their brief, Plaintiffs prominently quote a statement by Defendant Kekedjian in 2021 saying that we "*intend* on continuing [a $2 quarterly distribution], *at least at this point in time*, *unless things change*."  Opp. at 6 (emphasis

---

[2] The closest Plaintiffs come is to argue that *Murray* denied a motion to dismiss in a case involving statements regarding distributions.  Opp. at 26.  However, *Murray* (1) did not involve claims subject to the PSLRA's heightened pleading requirements; (2) did not involve allegations regarding undisclosed motives; and (3) relied upon a duty theory that has been rejected by the Supreme Court.  *Murray*, 2023 WL 4295600, at *4-5 (basing omission claim upon Item 303); *Macquarie*, 601 U.S. at 259-60 (Item 303 does not give rise to actionable duty).

added).  But rather than guaranteeing $2 distributions going forward, this statement is plainly a statement of current intent that explicitly notes that things could "change."

Plaintiffs also argue that statements about IEP's future distributions are not protected under the PSLRA's safe harbor because IEP is a partnership.  Opp. at 22-23 (citing 15 U.S.C. § 78u–5(b)(2)(E)).  But this argument is irrelevant because, even if IEP's statements regarding its future distributions were not protected by the safe harbor, Plaintiffs fail to plead facts showing that any such statement was misleading.  The argument is also legally flawed.  IEP is a "limited partnership" not a general "partnership."  *See*, *e.g.*, 15 U.S.C. § 78n(d)(2) (imposing an obligation on "partnerships" and "limited partnerships").  Courts routinely apply the PSLRA's safe harbor to limited partnerships.  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).  In any event, IEP's forward-looking statements are protected by the bespeaks caution doctrine.  *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 796 (11th Cir. 2010); *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 767-68, 767 n.18 (11th Cir. 2007)).

Lastly, IEP repeatedly and explicitly warned investors in its public filings and the Partnership Agreement that the size of distributions could change at the discretion of IEP GP's board.  Mot. at 6-7, 22.  Plaintiffs argue—without addressing the actual disclosures—that Defendants' warnings regarding future distributions are "boilerplate."  Opp. at 23.  However, the warnings were specifically tailored to IEP and far from boilerplate.

**E.      Plaintiffs Fail to Plead Any Misstatement or Omission Based on the Alleged Dividend Inducement Scheme**

As discussed in Defendants' Motion and above, Plaintiffs fail to allege a misrepresentation claim based upon their made up "Dividend Inducement Scheme" because:  (1) they allege no facts

10

to support the scheme; (2) as detailed above, Defendants disclosed all of the components of the purported scheme and had no duty to disclose their purported motivations even if they were what Plaintiffs have fabricated; and (3) Mr. Icahn always had more than enough capital to cover any margin call and avoid losing control of IEP.  Mot. at 19-20.  Indeed, he had approximately $5 billion in personal capital that he could use to satisfy his personal loans and an additional more than 30 million IEP units that that he could pledge without any risk of losing control.  Ex. 1, 2022 10-K at 35, 55, 124 & n.(c); *supra* note 1.  In response, Plaintiffs rely upon cases that are inapposite.  Opp. at 27-28.  *Alabama Farm* dismissed a misrepresentation claim based upon non-disclosure of a purported scheme, because the securities laws do not require the disclosure of a company's motivations.  606 F.2d at 608; *see also ADT Corp.*, 660 F. App'x at 856.  And *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc*. 2023 WL 1800963 (D. Ariz. Feb. 7, 2023), did not deal with a failure to disclose supposed motivations.  Rather that case merely held that claims based upon non-GAAP measures can proceed where—unlike here—the plaintiff alleges that non-GAAP measures were calculated differently than how the company said they would be calculated.  *Id.* at *15-16.

> **F.      Plaintiffs' Misrepresentation Theory Regarding the ATM Offerings Fails**

Plaintiffs claim that IEP's ATM offerings were somehow misrepresented because the proceeds were necessary to fund the distribution.  This theory fails for several reasons.  First, IEP's public filings demonstrate that IEP always had far more liquidity than it needed to fund the distributions, even without the ATM offerings.  As set forth in a detailed chart in the Motion, which Plaintiffs ignore in their Opposition, IEP had billions in cash and far more cash than it ever paid out in distributions.  Mot. at 8-9.  Second, IEP always disclosed the ATM offerings and the amounts raised through them, along with the amounts paid in distributions, in its public filings.  *Id.*  The ATM offerings cannot form the basis of a claim where the material facts about them were accurately disclosed.

11

**G.      Plaintiffs Fail to Allege Misstatements or Omissions Based on Indicative NAV**

In the Motion, Defendants established that Plaintiffs fail to state a claim based upon Indicative NAVs because:  (1) Plaintiffs do not plead their claims with particularity; (2) Plaintiffs do not allege that IEP failed to follow its disclosed methodologies; and (3) Indicative NAV statements are non-actionable opinions.  Mot. at 24-28.

In their Opposition, Plaintiffs do not identify any allegations regarding Indicative NAV disclosures occurring before late-2021.  Mot. at 25 (explaining that the Complaint contains no allegations regarding this time period).  Nor do Plaintiffs even mention Viskase's or the Real Estate Segment's Indicative NAVs.  Moreover, Plaintiffs simply ignore cases holding that non-GAAP measures are not actionable where the company followed the disclosed methodologies.  *See* Mot. at 25-26 (citing cases).  Instead, Plaintiffs rely on *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843 (D. Ariz. Mar. 11, 2020).  Opp. at 21.  But in *Jackson*, defendants disclosure of merging companies' non-GAAP revenues was misleading where it misleadingly combined GAAP revenue and non-GAAP revenue of the two companies.  2020 WL 1170843, at *8.  Plaintiffs do not make comparable allegations here because IEP separately reported GAAP and the Indicative NAVs and clearly followed the disclosed Indicative NAV methodologies.

Plaintiffs also argue that the Indicative NAV calculations cannot be opinions because they were not expressly identified as a "belief or opinion."  Opp. at 19.  But *Omnicare* required no such thing.  And here, there can be no doubt that IEP informed the market through numerous, explicit statements that the Indicative NAV calculations are "subjective" analyses on which investors "may reasonably differ"—in other words, opinions.  Mot. at 27-28.

**H.      Plaintiffs Fail to Allege GAAP Violations for IEP's Automotive Segment**

In their Complaint, Plaintiffs seemed to allege two GAAP violations, *i.e.*, that IEP should have: (1) impaired the Automotive Segment's goodwill; and (2) taken a $226 million impairment

charge with respect to the Auto Parts division one quarter earlier, *i.e.*, by year-end 2022 instead of in Q1 2023. They also allege that various IEP officers signed false SOX Certifications.

In their Opposition, Plaintiffs appear to have abandoned their goodwill claim. In their Motion, Defendants argued that this claim failed for many reasons, including because the Auto Parts division's goodwill had been written down years ago. Mot. at 28-29. Plaintiffs fail to respond. The word "goodwill" does not appear anywhere in Plaintiffs' Opposition. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"); *Gomez v. Miami-Dade Cnty.*, 563 F. Supp. 3d 1211, 1218 (S.D. Fla. 2021) ("Courts in this district regularly deem claims abandoned where a plaintiff raises the claim in a complaint, but then fails to defend it in opposition to a motion to dismiss.") (collecting cases).

With respect to the $226 million charge, Plaintiffs argue that IEP should have written down Auto Plus's assets earlier in light of various "triggering events." Opp. at 29. However, Plaintiffs do not identify which assets should have been written down—an especially glaring failure given that all goodwill had already been written off. Nor do they allege particularized facts showing that (a) IEP failed to analyze the so-called triggering events; or (b) any Defendant believed these events warranted Auto Parts filing for bankruptcy in December 2022.[3]

---

[3] Amazingly, Plaintiffs continue to claim that IEP "concealed" negative developments regarding the Auto Parts division until 2023, Opp. at 29, despite the fact that IEP made numerous disclosures before 2023 describing those very developments. Mot. at 9-10, 28 n.5.

Plaintiffs also do not address the numerous cases rejecting claims based upon an alleged failure to recognize an impairment earlier.  Mot. at 30-32.  Instead, Plaintiffs cite *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002).  Opp. at 29.  But *Scientific-Atlanta* is not an impairment case; rather, it is a case about channel stuffing.

Likewise, Plaintiffs ignore Defendants' cases holding that valuations and impairment determinations are opinions.  Instead, they cite *Ramirez v. Exxon Mobil Corp.*, an out-of-circuit case contrary to a ruling by another Texas district court, 334 F. Supp. 3d 832, 848 (N.D. Tex 2018), and contrary to the overwhelming weight of authority, *see* Mot. at 27-28, 32 (citing cases).  *See also City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*, 856 F. 3d 605, 613 (9th Cir. 2017); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d. Cir. 2011).

Finally, Plaintiffs fail to address the numerous cases demonstrating that their allegations regarding the SOX Certifications are deficient.  Mot. at 33-35.  Plaintiffs rely upon a single case, *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011 (M.D. Fla. Oct. 16, 2019), to assert that the SOX certifications are actionable because Defendants failed to disclose an alleged fraudulent scheme.  Opp. at 29.  But Plaintiffs plead no particularized facts establishing such a scheme existed, let alone that the IEP representatives who signed the SOX Certifications were aware of the purported scheme when they signed the Certifications.

## II.  PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE SCHEME

### A.  Plaintiffs' Scheme Liability Claim Violates Pleading Rules

Like Plaintiffs' misrepresentation claims, Plaintiffs' scheme liability claim fails, first, because Plaintiffs violate applicable pleading rules.  In *In re Tupperware Brands Corp. Sec. Litig.*, the Eleventh Circuit affirmed the dismissal of a scheme liability claim because the claim was "improperly pleaded"—a "fundamental" error.  2023 WL 5091802, at *8 (11th Cir. Aug. 8, 2023).  The court explained that the plaintiffs had brought "two different claims—one misrepresentation

14

claim and one scheme liability claim—in the same count," which made it "virtually impossible" to know which allegations pertained to which claim. *Id.* (cleaned up); *see also Gnanaraj v. Lillium*, 2023 WL 9064669, at *7 (S.D. Fla. Dec. 18, 2023); *In re Galectin Therapeutics, Inc. Sec. Litig.*, 157 F. Supp. 3d 1230, 1239 (N.D. Ga. 2015). Here, Plaintiffs "commit[] the mortal sin" of incorporating all proceeding paragraphs into its claim for scheme liability. *Gnanaraj*, 2023 WL 906466 at *6 (quoting *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1322 (11th Cir. 2015)). Plaintiffs "also commit[] 'the sin of not separating into a different count each cause of action." *Id.* at *7. For these reasons, the claim should be dismissed.

**B.      Plaintiffs Fail to Plead a Claim for Scheme Liability**

Even if Plaintiffs had not violated "fundamental" pleading rules, their scheme liability claim would fail. Plaintiffs do not plead particularized facts to support the scheme, *e.g.*, they allege no actual facts showing that Defendants made the distribution payments to protect Mr. Icahn from a margin call. *In re Tupperware Brands Corp. Sec. Litig.*, 2021 WL 247870, at *5 (M.D. Fla. Jan 25, 2021) (dismissing claim where the plaintiff does not allege facts showing that the conduct was "designed to deceive or defraud investors").

Moreover, Plaintiffs fail to allege deceptive *conduct*—as opposed to the same misrepresentations on which they rely for their other claims. Under the federal securities laws, "misleading statements and omissions only create scheme liability in conjunction with conduct beyond those misrepresentations or omissions." *ADT Corp.*, 660 F. App'x at 858 (quotation omitted). However, the conduct must itself be "deceptive." *In re Tupperware Brands Corp. Sec. Litig.*, 2022 WL 354517, at *4 (M.D. Fla. Feb. 4, 2022). In *ADT Corp.,* the Eleventh Circuit affirmed dismissal of a scheme liability claim on the ground that plaintiffs failed to plead facts showing that the "stock repurchase plan itself was deceptive." *ADT Corp.*, 660 F. App'x at 859. Rather, in that case plaintiffs alleged merely that defendants failed to disclose "the motivations

behind the transaction," which was insufficient.  *Id*.  Similarly, in *Galectin*, the court dismissed the claim because the plaintiffs had described only conduct that was "not prohibited, such as working with stock promoters and planning the timing of articles, and, fundamentally, [alleged] nothing more than an omission claim."  157 F. Supp. 3d at 1239.

Here, Plaintiffs allege no facts showing that the "conduct" at issue—the payment of quarterly distributions or the selling of units through the ATM offerings—was itself prohibited or deceptive.  They do not allege that the distributions were not, in fact, paid or that the units were not, in fact, sold.  Instead, Plaintiffs improperly try to bring a scheme claim based upon allegations that IEP hid its true motivations for issuing distributions.  Putting aside that failure to disclose motivations is not actionable, under Eleventh Circuit precedent, there is "no difference between this [theory] and the material misstatement and omission claim."  *ADT Corp.*, 660 Fed. App'x. at 859.  Therefore, the scheme claim must be dismissed.[4]

---

[4] In *Alabama Farm*, the scheme liability claim survived because the plaintiff alleged facts showing that the buyback program *itself* created a false picture of the true demand for the stock which "unduly affect[ed] the market so that the board members could keep their jobs."  *ADT Corp.*, 660 F. App'x at 859.  As the Eleventh Circuit explained in *ADT Corp.* when distinguishing *Alabama Farm*, the *Alabama Farm* defendants "allegedly designed the repurchase plan to increase the share price so that no one else could afford to buy the shares and take over the company," which was "deceptive conduct because it altered the market for the shares in a misleading manner." *Id.* at 859; *see also Hennington v. ADT Corporation*, 161 F. Supp. 3d 1161, 1207 n.11 (S.D. Fla. 2015) (distinguishing *Alabama Farm*).

In light of these cases, Plaintiffs fall back on a new theory: they now assert that Defendants engaged in a "pump and dump" scheme. Opp. at 12-13. But Plaintiffs do not even plead an actual pump and dump scheme. "'Pump-and-dump' is a form of stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the cheaply purchased stock at a higher price." *S.E.C. v. Curshen*, 888 F. Supp. 2d 1299, 1301 n.3 (S.D. Fla. 2012). Here, Plaintiffs argue that IEP paid out distributions as a "pump" to inflate its unit price and then "dumped" units through its ATM offerings. Opp. at 13. This theory suffers from two flaws. First, the payment of distributions is not a false statement. Second, even assuming the distribution is an alleged "pump," there is no "dump." Under Plaintiffs' theory, Defendants obtained additional proceeds through the ATM offerings which they then used to pay distributions to other unit holders. They did this, Plaintiffs allege, to protect Mr. Icahn from having to sell, *i.e.*, to keep him from "dump[ing]" units, which he did not do. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1265, 1274 n.7 (11th Cir. 2016) (plaintiff alleges "at most, a 'pump' without a 'dump'" where individuals did not sell their shares).

## III.   PLAINTIFFS FAIL TO PLEAD SCIENTER

To recover under their misrepresentation or scheme liability theories, Plaintiffs must plead with particularity facts showing that Defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A). As discussed in the original Motion and below, Plaintiffs do not come close.

### A.   Plaintiffs Fail to Plead Scienter with Particularity as to Any Individual Defendant

Plaintiffs' core allegations of wrongdoing are that, during the putative Class Period, IEP paid $2 quarterly distributions to drive up the price of IEP units and protect Mr. Icahn from a margin call; in July 2023, IEP announced the restructuring of Mr. Icahn's loans; and, in August 2023, IEP cut the quarterly distribution to $1 because Mr. Icahn's loans no longer turned on the

17

market price of IEP's units.  Mot. at 11-13; ¶¶ 279-80, 285-89.  But Plaintiffs fail to allege a single particularized fact—whether based upon statements by IEP representatives, confidential witnesses, or documents—showing that any Defendant *ever* acted with this purpose or even knew about the alleged scheme.  Plaintiffs simply made it up.  And they do not allege any *facts* showing that Mr. Icahn's loans had anything to do with the distributions.  While Plaintiffs seek to avoid scrutiny of their allegations by lumping them together and claiming they "holistically" allege scienter, Opp. at 34-35, Plaintiffs do not overcome their failure to cite "documentation, communication, or conversation suggesting that [Defendants] knew anything about the alleged fraud."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1250 (11th Cir. 2008).

Plaintiffs also do not demonstrate that any inference of scienter is more than "merely 'reasonable' or 'permissible,'" which they must do.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  Specifically, Plaintiffs fail to allege facts showing that the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*  For instance, Plaintiffs allege that the Dividend Inducement Scheme was designed to protect Mr. Icahn from a margin call so that he could maintain control over IEP.  But IEP's public filings render this claim entirely implausible.  As detailed above, IEP's 2022 10-K disclosed that Mr. Icahn had 118,558,457 IEP units unpledged at that time, including 30,165,411 units that he could use to satisfy any margin call with zero risk he could lose control of the company.  *See supra* at 5.  In that same 10-K, IEP disclosed Mr. Icahn also personally owned approximately $5 billion in interests in the investment funds managed by IEP.  He therefore had extensive assets with which to satisfy his personal loans.  As such, it is simply not plausible that Defendants concocted the "Dividend Inducement Scheme" to protect Mr. Icahn from a margin call he could easily meet, let alone the near impossibility that he would lose control of IEP.

18

Plaintiffs also allege that IEP cut its quarterly distribution from $2 to $1 because Mr. Icahn had restructured his loans.  Again, they made this up.  They allege no facts showing that any inference of such scienter is "cogent" and "as compelling" as the opposing inference, *i.e.*, that IEP cut the distribution to $1 thereby maintaining its historical distribution yield of about 14%, rather than the 25% yield that would have resulted from a continued $2 quarterly distribution.[5]  While Plaintiffs assert IEP said nothing about the distribution yield when lowering the distribution, Opp. at 3 and 37 n.7, Plaintiffs are wrong.  *See* Ex. 36, Q2 2023 Earnings Call at 7 (explaining the distribution was cut because "the world has changed, at least for us, given a number of these articles [the Hindenburg Reports] . . ." and that "even when you look at the dividend yield that would be implied based on share prices and per unit, it remains a healthy and attractive dividend yield").

Plaintiffs also claim that Defendants' calculation of the distribution yield is "false and deceptive," Opp. at 3, and "untrue," *id.* at 37 n.7.  Plaintiffs are wrong.  It is Plaintiffs' calculation that is wrong because they rely on a chart in their Complaint that, whether because of a mistake or

---

[5] The distribution yield is calculated by dividing the unit price on a given day by the annual distribution paid.  As Plaintiffs set forth in their Complaint, this yield averaged approximately 14% during most of the class period because the distribution averaged $8 per year and the trading price averaged approximately $57 per unit.  ¶¶ 295-98.  After the Hindenburg Report, IEP's unit price dropped, and it was trading at $32.68 per unit on August 3, 2023, when the distribution was lowered to $1 per unit.  At $4 per year, divided by $32.68 per unit, the yield was 12.2%, whereas it would have been double that, at 24.4%, if the distribution had not been reduced.  Mot. at 12.

19

otherwise, simply has the wrong prices.[6]  ¶ 33; *compare with* Ex. 33.  When one uses actual IEP unit prices, the distribution yield on August 3, 2023, would have been far in excess of any yield throughout the class period if IEP had maintained a $2 distribution.

Beyond these failures, Plaintiffs choose simply to ignore four key facts that wholly undermine their theory of scienter.

- *First*, IEP *did* disclose that Mr. Icahn pledged IEP units as security for margin loans, as well as the number of pledged and unpledged units—something it would not have done if it were engaged in a hidden scheme.  *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1203-04 (10th Cir. 2015) (disclosures of shares pledged for collateral on margin loans "support[ed] the defendants' proposed alternative, nonculpable inference");

- *Second*, neither Mr. Icahn nor any of the other Individual Defendants *ever* sold IEP units during the putative Class Period.  *Mizzaro*, 544 F.3d at 1253 ("the lack of [stock] sales weighs against inferring scienter");

- *Third*, Mr. Icahn dramatically *increased* his holdings of IEP units during the putative Class Period.  In fact, Mr. Icahn lost billions of dollars in value by continuing to hold and acquiring more stock during the Class Period—conduct that no fraudster would undertake.  *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp.

---

[6] Plaintiffs' chart appears to rely on "adjusted prices" that subtract out the value of any distribution paid prior to a chosen date, an adjustment Plaintiffs never explain.  ¶ 33.  IEP's units never traded at these "adjusted" prices, and those prices are not relevant for calculating the distribution yield, a fact Plaintiffs acknowledge by using actual prices in their other yield calculations.  ¶ 295.

3d 1256, 1268 (S.D. Fla. 2023) (increases in stock holdings "weigh[] against a finding of scienter"); Mot. at 42 (citing cases); and

- *Fourth*, IEP's financial statements were audited by Grant Thornton and have never been restated; nor have the audit opinions been withdrawn.  Mot. at 43-44 (citing cases).

**B.      Plaintiffs' Efforts to Avoid Pleading as to Each Individual Defendant Fail**

For the reasons discussed above, Plaintiffs' attempt to plead scienter fails as to all Defendants.  But it also fails because Plaintiffs do not make particularized allegations as to each Individual Defendant.  Plaintiffs cannot plead scienter through group pleading.  Mot. at 37.  While Plaintiffs assert that they have not engaged in group pleading, Opp. at 26, their Complaint belies this assertion.  *See*, *e.g.*, ¶¶ 327, 383-385, 389, 396, 398, 427, 428.

Plaintiffs also cannot rely on the "core operations" doctrine to avoid pleading "specific facts establishing scienter as to each Defendant."  Opp. at 31.  Rather, that doctrine can only bolster an inference of scienter where, as Plaintiffs concede, there are other "allegations that defendants knew of illegal practices."  Opp. at 31 (describing *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018)).

Plaintiffs cannot allege scienter by pointing to the positions held by each Individual Defendant. Mot. at 38 (citing cases).  Indeed, the cases Plaintiffs cite involved particularized allegations showing that, unlike here, the defendants had specific information that contradicted the public statements they made.  *See*, *e.g.*, *Flowers,* 2018 WL 1558558, at *14; *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010).  Here, Plaintiffs fail to allege that any Individual Defendant, at any time, had information showing that the distributions were part of a scheme or that the GAAP or Indicative NAV calculations were incorrect.

As such, this case is much more like another case Plaintiffs cite, *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336 (S.D. Fla. 2015). In that case, the court dismissed claims against certain defendants, explaining that "when scienter allegations are based on an executive's knowledge and access to material that contradicts the company's or his/her public statements, there must be particularized allegations that the executive knew or was severely reckless in disregarding true facts." *Id.* at 1373. There, as here, the claim failed because the plaintiffs had "omit[ted] the necessary details of what specific information was received by [certain defendants], what they ignored or were severely reckless in disregarding (e.g., documents, emails, recommendations from others, etc.)." *Id.* In short, Plaintiffs do not, because they cannot, allege any specific facts the Individual Defendants knew that contradicted their public statements.

## C.   Plaintiffs Fail to Plead Scienter for Mr. Icahn

All of the arguments set forth above apply to all Defendants, including Mr. Icahn. The few arguments that Plaintiffs make regarding Mr. Icahn do not save their claim against him. For instance, Plaintiffs argue that Mr. Icahn acted with scienter because he knew the terms of his own personal margin loans, including that the LTV ratios were linked to IEP's unit trading price, and that such information had not been disclosed. Opp. at 34 (citing ¶¶ 8, 68, 250). But IEP *did disclose* that Mr. Icahn pledged IEP units as security for his loans, that the number of units pledged turned on the market price of IEP units, and that he had assets far in excess of those necessary to cover any margin call. It had no duty to say more. *See* Mot. at 16-18, 40. Likewise, Plaintiffs argue Mr. Icahn was aware that the Company issued distributions and disclosed its Indicative NAV. To survive a motion to dismiss, however, Plaintiffs must allege facts showing that Mr. Icahn knew about the "alleged fraud." *Mizzaro*, 544 F.3d at 1250. Here, Plaintiffs nowhere allege that any Defendant—including Mr. Icahn—knew that issuance of the distributions was fraudulent or that the Indicative NAVs were misstated.

22

Plaintiffs also argue that Mr. Icahn had a motive to commit fraud because he wanted to avoid a margin call. Opp. at 36. As explained above, Mr. Icahn always had more than enough assets to cover a margin call. And regardless of this fact, "motive and opportunity to commit fraud, standing alone, are insufficient to establish scienter in this Circuit." *FindWhat*, 658 F.3d at 1303 (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999)). Indeed motive to maintain stock prices is entitled to little weight, because all corporate officers have that motivation. *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998). And as a case Defendants cited held, allegations that an executive sought "to avoid a margin call are too general to raise a strong inference of scienter." *In re Dynergy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 899 (S.D. Tex. 2004). Plaintiffs try to evade all of this precedent by citing cases that involve both stock sales *and* other scienter allegations. Opp at 34. Here, of course, Mr. Icahn never sold units; to the contrary, he kept acquiring units—conduct that is wholly contrary to scienter. Mot. at 41-42.

Lastly, Plaintiffs argue that Mr. Icahn (and others) acted with scienter by responding to the Hindenburg Report. Opp. at 37, 39, 41. However, Defendants had more than a good faith basis for responding. For instance, Hindenburg claimed that IEP's Indicative NAV calculations were misstated without ever claiming that IEP failed to follow its disclosed methodologies. IEP was fully within its rights to respond. Moreover, the primary case Plaintiffs cite is inapposite. Opp. at 39-40 (citing *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005)). In that case, the defendant called the report "malicious" without ever looking into the alleged accounting errors. *Spear*, 399 F. Supp. at 1359. Here, by contrast, IEP issued a detailed response which addressed IEP's Indicative NAV calculations. Ex. 6, May 10, 2023 Press Release. Lastly, had IEP not responded, Plaintiffs would likely have claimed that IEP's failure was evidence of scienter.

*Theodore v. PureCycle Technologies*, 2023 WL 4035880, at \*7 n.7 (M.D. Fla. June 15, 2023) ("failure to push back" against short seller report supports inference of scienter).

### D.      Plaintiffs' Remaining Scienter Allegations Fail

#### 1.      Plaintiffs Do Not Allege Scienter Based upon Repeated Statements

Plaintiffs cannot remedy their failure to plead scienter by pointing out that some representations were made repeatedly.  Many of Defendants' repeated statements—such as their warnings that "there can be no assurance or in what amounts future dividends might be paid" or that Indicative NAV reflects IEP's "subjective" beliefs and is of "limited use"—were designed to warn investors of risks.  Other statements—such as IEP's quarterly Indicative NAV calculations or its description of efforts to improve the Auto Segment's performance, Opp. at 18, 37—were entirely proper and expected.  As such, this case is nothing like *PureCycle*. 2023 WL 4035880, at \*7 (defendants repeatedly touted their own experience without disclosing that they had previously caused six businesses to fail, demonstrating an intent to fool investors regarding their skill).

#### 2.      Plaintiffs' Argument Regarding GAAP Violations Fail to Establish Scienter

Lastly, as Defendants established in their Motion, Plaintiff do not plead facts showing that GAAP was violated or that any purported violations were committed with scienter.  Mot. at 42-44.  In response, Plaintiffs argue that GAAP violations, "in combination with 'red flags' of impropriety" support an inference of scienter.  Opp. at 33.  However, Plaintiffs do not allege that Defendants were ever informed of any accounting "red flags" regarding IEP's audited financial statements.  Indeed, none has been restated and Grant Thornton's audit reports have not been withdrawn—failures which undermine any claim of scienter.  Mot. at 43-44 (citing cases).

## IV.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION

Lastly, Plaintiffs claims fail because they do not allege loss causation.

*First*, with regard to the May 2, 2023 Hindenburg Report, the Eleventh Circuit has twice held that an unfavorable short seller report is insufficient to demonstrate loss causation. *Meyer v. Green*, 710 F.3d 1189, 1197-98 (11th Cir. 2013); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863-64 (11th Cir. 2015).  In response, Plaintiffs cite *Bush v. Blink Charging Co.*, 2023 WL 8263037 (S.D. Fla. Nov. 27, 2023).  However, in *Bush*, the short seller conducted its own factual investigation and reported that many of defendants' charging stations were non-functional, a fact that was not publicly known.  *Id.* at *10.   Here, by contrast, the Hindenburg Report was expressly based only on publicly available information.

*Second*, IEP's statement on May 10, 2023 concerning the request for information by the U.S. Attorney's Office for the Southern District of New York is not a corrective disclosure.  *Meyer,* 710 F.3d at 1201 ("the commencement of [a government] investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10b").  Nor was the Company's disclosure of a $226 million charge a corrective disclosure, given that IEP had previously disclosed Auto Parts' bankruptcy and that a charge would be taken in the future.

 Finally, the August 4, 2023 press release announcing a distribution cut was not a corrective disclosure.  While Plaintiff argues that this disclosure "ended" the Dividend Inducement Scheme, the disclosure said nothing about IEP's Indicative NAV, goodwill, impairment charge, or offerings.   Rather than revealing information showing prior representations were false, the distribution decrease was consistent with IEP's public warnings regarding future distributions. *See Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1448 (11th Cir. 1997) (dividend cut not corrective disclosure).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Consolidated Complaint with prejudice.

Dated: May 13, 2024                              Respectfully submitted,

*/s/ Mark A. Levy*
Mark A. Levy (Fla. Bar No. 121320)
mark.levy@brinkleymorgan.com
BRINKLEY MORGAN
100 SE Third Avenue, 23rd Floor
Fort Lauderdale, FL 33394
Telephone: (954) 745-1161

Michael S. Doluisio*
Bina M. Peltz*
michael.doluisio@dechert.com
bina.peltz@dechert.com
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2325

Jonathan R. Streeter *(pro hac vice pending)*
Nicholas R. Gersh*
Nina S. Riegelsberger*
jonathan.streeter@dechert.com
nicholas.gersh@dechert.com
nina.riegelsberger@dechert.com
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 649-8755

*Counsel for Defendants*

*Admitted Pro Hac Vice

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2024, I served a true and correct copy of the foregoing

Reply upon all counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Mark A. Levy*
MARK A. LEVY