**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:23-cv-21773-KMM

PHILIP KOSOWSKY,
Individually and on Behalf of All Others
Similarly Situated,

      Plaintiffs,

v.

ICAHN ENTERPRISES L.P., *et al.*,

      Defendants.

                                 /

## <u>ORDER</u>

THIS CAUSE came before the Court upon Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ("Mot.") (ECF No. 97). Lead Plaintiff Philip Kosowsky and Plaintiff Gary Coton (collectively, "Plaintiffs") filed an Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ("Resp.") (ECF No. 99). Defendants filed a Reply in Support of the Motion to Dismiss the Consolidated Class Action Complaint. ("Reply") (ECF No. 102). The Motion is now ripe for review.

## I.   BACKGROUND[1]

This case arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities Exchange Commission

---

[1] The following background facts are taken from the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consol. Compl.") (ECF No. 85) and are accepted as true for purposes of ruling on this Motion to Dismiss. *See Fernandez v. Tricam Indus., Inc.*, No. 09-22089-CIV-MOORE/SIMONTON, 2009 WL 10668267, at *1 (S.D. Fla. Oct. 21, 2009).

The Court further notes that Lead Plaintiff filed an Unopposed Motion to Take Judicial Notice, wherein he requests the Court to take judicial notice of the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, In the Matter of Carl. C. Icahn, Administrative

("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Consol. Compl. ¶ 34.  The

Lead Plaintiff in this consolidated class action lawsuit is Philip Kosowsky, who purchased Icahn

Enterprises ("IEP") securities between August 2, 2018 and August 3, 2023, inclusive (the "Class

Period").  *Id.* ¶¶ 1, 38.  The Defendants are Icahn Enterprises L.P., a master limited partnership

holding company and equity fund whose depositary units trade on the Nasdaq Global Select

Market (the "NASDAQ") under the symbol "IEP"; Icahn Enterprises Holdings L.P.; Icahn

Enterprises G.P. Inc. (collectively, "Icahn Enterprises" or "IEP"); Carl C. Icahn, IEP's Chairman

of the Board and controlling IEP unitholder at all relevant times; David Willetts, IEP's President

and Chief Executive Officer since November 8, 2021; Ted Papapostolou, IEP's Chief Financial

Officer and a member of the Board of Directors since November 8, 2021; Aris Kekedjian, IEP's

President and Chief Executive Officer and a member of the Board of Directors from June 14, 2021

to November 8, 2021; Keith Cozza, IEP's President and Chief Executive Officer and a member of

the Board of Directors from 2014 to June 14, 2021; and SungHwan Cho, IEP's Chief Financial

Officer and a member of the Board of Directors from 2012 to April 2021 (collectively, the

"Individual Defendants").  *Id.* ¶¶ 40–48.

---

Proceeding File No. 3-22012 ("Icahn Cease and Desist Order") attached hereto as Exhibit 1 and
the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities
Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, In the Matter
of Icahn Enterprises, L.P., Administrative Proceeding File No. 3-22012 (the "IEP Cease and Desist
Order").  *See generally* (ECF No. 111).  Because the Icahn Cease-and-Desist Order and the IEP
Cease-and-Desist Order are a matter of public record and are available on an official government
website, this Court is permitted to take judicial notice of them.  *See Schiano v. Salkin*, No. 19-
60015, 2019 WL 3997129, at *2 (S.D. Fla. Aug. 23, 2019).  Defendants also filed an Unopposed
Motion to Take Judicial Notice, wherein Defendants request the Court to take judicial notice of
IEP's unit price at the close of trading on various dates.  *See generally* (ECF No. 112).  Because
this information is not subject to reasonable dispute since it can be accurately and readily
determined from reliable sources, the Court may take notice of the IEP unit prices.  *See Lanfear v.
Home Depot, Inc.*, 679 F.3d 1267, 1282 n.17 (11th Cir. 2012).  As such, both motions to take
judicial notice are granted.

Icahn Enterprises is a publicly traded master limited partnership holding company and equity fund, owning multiple subsidiaries including an Automotive Group Division. *Id.* ¶ 2. Carl Icahn, a well-known "corporate raider" and "activist" with a reputation for taking over and improving distressed companies, has been the majority unitholder at Icahn Enterprises since the company went public in 1990. *Id.* ¶ 3. IEP was the "proverbial 'dividend stock' investment:" IEP shareholders consistently enjoyed healthy dividends from 2014 through 2018. *Id.* ¶¶ 58–61, 64. Paying robust dividends promoted market demand, while Mr. Icahn's "magic touch" as a businessman and investor held the promise of improved asset value of acquired companies. *Id.* ¶ 64. IEP consistently paid quarterly dividends of $2.00 per unit during the Class Period, and in November 2021, sell-side analyst firm Jefferies even presented a "long view" analysis of IEP indicating a "[c]onstant dividend of $8.00/sh into perpetuity." *Id.* ¶ 65.

But Plaintiffs claim these dividends were far higher than IEP's operating results justified, creating a misleading impression of IEP's financial health. Plaintiffs allege that during the Class Period, IEP engaged in a scheme to artificially inflate its stock price by issuing unsustainable dividends while concealing key financial information from investors—what Plaintiffs describe as the "Dividend Inducement Scheme." *Id.* ¶ 7. The Consolidated Complaint alleges that this scheme allowed IEP to maintain the stock price at levels that supported Icahn's personal borrowing and financial interests. Carl Icahn's personal loans were tied to IEP's stock price through loan-to-value (LTV) covenants. *Id.* ¶ 6. Plaintiffs allege that Icahn secured massive margin loans from lenders using his IEP shares as collateral. *Id.* ¶ 68. Since his IEP units were pledged as collateral, lenders imposed debt covenants requiring Icahn to meet a minimum level of LTV ratios, failing which he would be vulnerable to margin calls requiring him to make good on the margin debt. *Id.* As long as the unit price remained high, Icahn could avoid margin calls. *Id.* Thus, Icahn had a

personal incentive to ensure that IEP's stock price remained artificially inflated through consistent and robust dividend payments, regardless of IEP's actual financial performance. This Dividend Inducement Scheme was hidden from investors. Instead, IEP repeatedly assured the market of its "ample liquidity" and the sustainability of its dividends, despite inconsistent financial metrics and mounting debt. *Id.* ¶ 10.

Plaintiffs further allege that the Automotive Group Division, specifically the Auto Parts Plus business, within IEP experienced a continuous decline in financial performance during the Class Period. *Id.* ¶¶ 16–17. Auto Parts Plus faced operational challenges, including supply chain disruptions, declining sales, and increased competition—these issues should have prompted IEP to take goodwill impairments earlier than it did, but the company allegedly delayed recognizing the true extent of the financial losses to continue inflating asset values in its public disclosures. *Id.* Specifically, Plaintiffs claim that IEP delayed recognizing a $226 million impairment charge related to the Automotive Group Division. *Id.* ¶ 17. While the impairment was eventually recognized in early 2023, Plaintiffs suggest that the impairment should have been accounted for much earlier due to the ongoing financial struggles at Auto Parts Plus. *Id.* ¶¶ 16–17, 249. In January 2023, Auto Parts Plus finally filed for Chapter 11 bankruptcy, which Plaintiffs claim shows that financial issues within the Automotive Group Division had been severe and ongoing during the Class Period. *Id.* ¶ 17. Auto Parts Plus faced significant store closures and a deteriorating market position during the Class Period; despite these clear indicators of impairment, IEP allegedly failed to properly disclose the extent of the problems, instead maintaining inflated asset values on its books. This failure to impair the goodwill related to the Automotive Group Division is framed as part of the broader Dividend Inducement Scheme to maintain what were ultimately unsustainable dividends.

The alleged scheme began to unravel on May 2, 2023, when Hindenburg Research published a report (the "Hindenburg Report") accusing Icahn Enterprises of maintaining an artificially high dividend that was unsustainable given its financial performance.  *Id.* ¶ 10.  The Hindenburg Report alleged that IEP was using money from new investors to fund its dividends. *Id.* ¶ 20.  The Report also highlighted that IEP's indicative net asset value was inflated by at least 22% and the company's actual free cash flow was negative $1.7 billion in the same year it raised its dividend from $1.75 to $2.00 per unit.  *Id.*  Finally, the Report warned that "Icahn has not disclosed basic metrics around his margin loans like loan-to-value (LTV), maintenance thresholds, principal amount, or interest rates" and "unitholders deserve this information in order to understand the risk of margin calls should IEP unit [trading] prices revert toward NAV."  *Id.* Following the publication of the Hindenburg Report, IEP's stock price plummeted, dropping by approximately 20% in a single day, and continued to fall thereafter.  *Id.* ¶ 22.  On May 10, 2023, Icahn Enterprises filed its Quarterly Report with the SEC and stated that the U.S. Attorney's Office for the Southern District of New York was seeking production of information relating to the company, certain of its affiliates' "corporate governance, capitalization, securities offerings, dividends, valuation, marketing materials, due diligence and other materials."  *Id.* ¶ 263.  The IEP trading price continued to drop from a close of $50.42 on May 1, 2023 to a price of $33.94 per depositary unit when the market opened on May 10.  *Id.* ¶ 267.

Faced with a massive margin call scenario, Carl Icahn restructured $3.7 billion in personal loans to remove the link between his obligation to post collateral and the IEP share price (the "de-linking").  *Id.* ¶¶ 27, 280.  Reuters reported that Icahn's collateral requirement was now tied to IEP's "indicative net asset value" (indicative NAV) rather than its unit price.  *Id.* ¶¶ 279–281. With his personal LTV ratio debt covenants no longer tied to IEP's trading price, Icahn was no

longer incentivized to continue the Dividend Inducement Scheme to avoid a massive margin call. *Id.* ¶ 29. Thus, in August 2023, IEP cut its dividend in half and announced a reduction in its quarterly dividend from $2.00 to $1.00 per unit, further exacerbating the stock price decline. *Id.* ¶¶ 29–30. Plaintiffs claim that this dividend cut only confirms that IEP's previous dividends were unsustainable and that the stock price had been artificially inflated by the alleged scheme.

Overall, Plaintiffs allege that IEP's public filings during the Class Period concealed key information about the company's finances. Plaintiffs point to several key disclosures that were allegedly misleading: (1) statements about IEP's dividend sustainability that created a false impression of the company's financial performance; (2) IEP's management referring to indicative NAV as a key metric to assess the company's value, which exceeded Generally Accepted Accounting Principles (GAAP)-based NAV by significant margins; and (3) failure to disclose Icahn's personal debt and loan covenants. Plaintiffs allege that because of these material misstatements and omissions, investors suffered significant financial losses when the true state of IEP's financial health was revealed. Lead Plaintiff Kosowsky was one such investor who purchased IEP securities during the Class Period and suffered damages as a result of the alleged federal securities law violations. *Id.* ¶ 38.

On May 11, 2023, Plaintiff Osaneme Okaro, individually and on behalf of all others similarly situated, filed the first class action lawsuit, *Okaro v. Icahn Enterprises L.P. et al.*, Case No. 1:23-cv-21773-KMM, against Defendants in this district. (ECF No. 1). This action was then consolidated with *Levine v. Icahn Enterprises L.P., et al.*, Case No. 1:23-cv-22009-KMM. (ECF No. 61). On November 20, 2023, the Court appointed Philip Kosowsky as Lead Plaintiff and approved his selection of Barrack, Rodos & Bacine as Lead Counsel. (ECF No. 82).

On January 12, 2024, Lead Plaintiff Kosowsky and Plaintiff Gary Coton filed the Consolidated Class Action Complaint on behalf of themselves and all others similarly situated. (ECF No. 85).  Plaintiffs assert the following causes of action against Defendants: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against all Defendants ("Count 1"), *id.* ¶¶ 422–432; and (2) violation of § 20(a) of the Exchange Act, against Individual Defendants ("Count 2"), *id*. ¶¶ 433–436.   Characterizing the 436-paragraph Consolidated Complaint as "long on speculation and short on facts," Defendants now move to dismiss this Action.  Mot. at 2.

## II.    LEGAL STANDARD

"To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation."  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (internal quotation marks omitted) (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008)).

A claim of securities fraud is subject to a "triple-layered pleading standard."  *Id.*  "To survive a motion to dismiss, a securities-fraud claim brought under rule 10b-5 must satisfy not only the run-of-the-mill federal notice-pleading requirements, *see* Federal Rule of Civil Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4."  *Id.* at 1317–18.

The Eleventh Circuit has explained that Rule 9(b), in the securities fraud context, "requires a plaintiff to allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Id.* at 1318 (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).

"The PSLRA—with some overlap—requires a complaint to 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)). The PSLRA "also requires, 'with respect to each act or omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The Eleventh Circuit has explained that the required state of mind "is an 'intent to defraud or severe recklessness on the part of the defendant.'" *Id.* (quoting *FindWhat*, 658 F.3d at 1299)). "[A] 'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.* (citing *FindWhat*, 658 F.3d at 1296).

## III. DISCUSSION

Defendants argue that the Consolidated Complaint should be dismissed because it (1) fails to allege any material misstatements or omissions with particularity, Mot. at 15–35; (2) fails to plead scienter, *id.* at 36–45; (3) fails to adequately plead loss causation, *id.* at 45–49; (4) fails to allege facts supporting scheme liability, *id.* at 49; and (5) fails to state a claim for control person

8

liability, *id.* at 50.  As explained below, the Court addresses only the issues of materiality and scienter.  Finding that the Consolidated Complaint fails to allege material misrepresentations or omissions made with scienter, the Court does not reach Defendants' other arguments.

### A.     Material Misrepresentations and/or Omissions

Defendants argue that (1) Plaintiffs fail to plead any misstatement or omission with particularity, Mot. at 15; (2) Plaintiffs do not state a claim based upon IEP not disclosing the terms of Mr. Icahn's loans, *id.* at 16–18; (3) the Consolidated Complaint fails to allege facts to support the Dividend Inducement Scheme theory, *id.* at 19–20; (4) Plaintiffs do not state a claim regarding the purported impact on distributions from the alleged "de-linking" of Icahn's loan covenants from IEP's unit price, *id.* at 20–23; (5) Plaintiffs fail to state a claim based upon IEP's offerings, *id.* at 23–24; (6) IEP's statements concerning indicative NAV are not actionable, *id.* at 24–28; (7) Plaintiffs fail to allege misstatements based on GAAP violations for the Automotive Group Division, *id.* at 28–35; and (8) Plaintiffs fail to allege misstatements or omissions as to Defendants Cozza, Cho, and Kekedjian, *id.* at 35–36.  Plaintiffs oppose each of Defendants' arguments.  Resp. at 15–29.

"A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat*, 658 F.3d at 1305).  "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the total mix of information made available.'" *Id.* (internal citation and quotation marks omitted) (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (per curiam)).  "The question of materiality is not subject to a bright-line test, but instead depends on the specific circumstances of each case,

including the totality of information available to investors." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 30, 37–45 (2011)). "The materiality requirement aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors." *Id.*

1.  <u>Alleged False or Misleading Statements and Omissions</u>[2]

Plaintiffs outline myriad alleged materially false and misleading statements made by Defendants during the Class Period. *See* Consol. Compl. ¶¶ 69–249. Without repeating the entire Consolidated Complaint here, the Court groups the alleged misstatements and omissions generally into the following buckets: (1) statements related to IEP's dividend sustainability that allegedly created a false impression of the company's financial performance; (2) IEP's management referring to indicative NAV as a key metric to assess the company's value, which significantly exceeded GAAP-based NAV; and (3) statements related to Carl Icahn's personal financial interests. The Court highlights just a few examples below:

> <u>Fourth Quarter 2018 Press Release, declaring a quarterly distribution in the amount of $2.00 per depositary unit</u>: **Icahn Enterprises has a long history of endeavoring to return capital to its unitholders by declaring and paying significant and consistent annual distributions.** As a reminder –
>
> Icahn Enterprises estimated annual distribution of $8.00 per depositary unit for fiscal year 2019
>
> Icahn Enterprises declared annual distributions of $7.00 per depositary unit for fiscal year 2018
>
> Icahn Enterprises declared annual distributions of $6.00 per depositary unit for fiscal year 2017
>
> Icahn Enterprises declared annual distributions of $6.00 per depositary unit for fiscal year 2016

---

[2] Bold text reflects Plaintiffs' emphasis in the Consolidated Complaint.

Icahn Enterprises declared annual distributions of $6.00 per depository unit for fiscal year 2015

*Id.* ¶¶ 86–87.

> First Quarter 2019 Press Release:  **The Company uses indicative net asset value as an additional method for considering the value of the Company's assets, and we believe that the information can be helpful to investors.**  Please note, however, that the indicative net asset value does not represent the market price at which the units trade.  Accordingly, data regarding indicative net asset value is of limited use and should not be considered in isolation.

*Id.* ¶ 97.

> First Quarter 2019 Conference Call with Defendant Cozza,[3] after an analyst asked why IEP chose to use at-the-market (ATM) offerings:  I think we evaluate all the methodologies to effectively raise capital, and we think this as a better path to give us more optionality.  We don't think -- we don't want to – in a traditional offering, I think you'll have to sell the stock at some discount, and we like the flexibility of this and we don't think the stock should be sold at a discount.  The stock is paying an $8-a-year dividend. It trades under 80.  So obviously, by definition, mathematically, that's greater than a 10% yield.  And if it trades lower, we like having the optionality of not selling stock.  And if it trades at what we think is a fair entry point or a fair level to raise capital, we may sell some stock.  But doing it the traditional way generally historically required a large discount.  We were willing to do that in years past in order to get some float out there and try to improve the liquidity, but this, we think, is a better option for all unitholders.

*Id.* ¶ 102.

> First Quarter 2021 Press Release:  Icahn Enterprises L.P. (Nasdaq:IEP) is reporting **first quarter 2021 revenues of $3.4 billion and net income attributable to Icahn Enterprises of $162 million, or $0.65 per depositary unit** . . . .  For the quarter ended March 31, 2021, indicative net asset value increased by $668 million to $4.22 billion compared to $3.55 billion as of December 31, 2020.  **On May 5, 2021, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit,** which will be paid on or about June 30, 2021 to depositary unitholders of record at the close of business on June 1, 2021.

---

[3] Defendant Keith Cozza was President and Chief Executive Officer and a member of the Board of Directors from 2014 until June 14, 2021.  *Id.* ¶ 47.

*Id.* ¶ 166.

> During the Second Quarter 2021 conference call, when asked about IEP's ability to fund its per unit distributions, Defendant Kekedjian[4] answered:  **funding the dividend is not necessarily an issue for us whatsoever.  We do like our current capital allocation policy.  As you know, we just approved a $2 dividend for the quarter, which has been consistent with relatively past practices.  And I think we intend on continuing that, at least at this point in time unless things change . . . . Well, we definitely have a high dividend yield and that's one of the factors that makes the stock attractive.**

*Id.* ¶ 184.

> 2021 Form 10-K included a footnote referring to Icahn's use of certain IEP units to secure certain personal indebtedness:  The number of depositary units pledged to secure these loans fluctuates in certain years and from time to time as a result of changes in the amount of outstanding principal amount of the loans, the market price of the depositary units, and other factors. Mr. Icahn has advised that he and his affiliates have sufficient additional assets to satisfy any obligations pursuant to these loans without recourse to the depositary units, he has no need or intention to allow foreclosure on such collateral, and that he is current on all principal and interest payments with respect to the loans, and there has never been an event of default or a default under any of the loans.

*Id.* ¶ 209.

Throughout the Consolidated Complaint, Plaintiffs assert that the disclosures made by IEP and Individual Defendants with respect to each fiscal year were untrue because they (1) "concealed from the market Defendants' dividend inducement scheme by which IEP and the Individual Defendants used heightened dividend yields . . . to buoy or inflate the trading price of IEP units and insulate Mr. Icahn from a massive margin call on his personal margin loan"; (2) concealed from the market that the loan-to-value ratios in Mr. Icahn's debt covenants tethered to IEP's unit trading price created a significant and material undisclosed risk of a margin call on Mr. Icahn's personal loans"; (3) "reported indicative net asset values were substantially inflated"; and (4)

---

[4] Defendant Aris Kekedjian was President and Chief Executive Officer and a member of the Board of Directors from June 14, 2021, until November 8, 2021.  *Id.* ¶ 46.

"concealed and failed to disclose that de-linking Mr. Icahn's loan covenant LTV ratios from IEP's unit trading price would adversely impact the Company's distribution of dividends."  *Id.* ¶¶ 92, 135, 165, 210, 249.

Now, the Court analyzes each of the aforementioned buckets of alleged misstatements and omissions.

2.      Statements Relating to Dividend Sustainability

The alleged Dividend Inducement Scheme is the foundation of Plaintiffs' securities fraud claim.   Plaintiffs allege that the Dividend Inducement Scheme was "done for [Icahn's] own personal benefit," *id.* ¶ 411, to "buoy and inflate those [stock] prices so as to avoid margin calls on his personal indebtedness," *id.* ¶ 409.  Defendants argue that IEP's financial performance and struggles were fully disclosed in quarterly and annual filings, including detailed discussions about liquidity and cash reserves.  They point to multiple SEC filings, including the below disclosure in the 2018 Form 10-K, that cautioned that there could be no assurance that future distributions would be paid:

> The declaration and payment of distributions is reviewed quarterly by Icahn Enterprises GP's board of directors based upon a review of our balance sheet and cash flow, the ratio of current assets to current liabilities, our expected capital and liquidity requirements, the provisions of our partnership agreement and provisions in our financing arrangements governing distributions . . . .  The payment of future distributions will be determined by the board of directors quarterly, based upon the factors described above and other factors that it deems relevant at the time that declaration of a distribution is considered.  Payments of distributions are subject to certain restrictions . . . .  There can be no assurance as to whether or in what amounts any future distributions might be paid.

Mot. at 6 (quoting Consol. Compl. ¶ 67); *see also* Reply at 8.  Defendants further argue that Plaintiffs do not identify any statement or document saying that the true motivation behind the dividends was to protect Icahn from a margin call, and in any event, Defendants had no duty to disclose their purported motivations.  Mot. at 19.  In response, Plaintiffs argue that IEP's Class

Period disclosures were deceptive because they concealed Defendants' Dividend Inducement Scheme and repeatedly misstated the basis used for setting the artificially inflated dividend amount. *See* Resp. at 15–16.

The Court finds that Plaintiffs have not sufficiently alleged a material misstatement regarding the sustainability of the dividend, nor have Plaintiffs identified any material misstatement regarding the true motivation behind IEP's dividend payments. IEP's public filings disclosed detailed information about the company's financial performance, warned that dividends could be reduced or even eliminated based on fluctuating financial conditions, and would have allowed a reasonable investor to assess for themselves the sustainability of the dividend. Plaintiffs have also not pointed to any specific statement that would have led a reasonable investor to believe that the dividend was guaranteed. The closest documents are perhaps the Jefferies reports predicting constant $2.00 per quarter dividends "in perpetuity," but that was not a statement made by Defendants. *See* Consol. Compl. ¶ 197. While the Court acknowledges that perhaps the dividend was excessive in hindsight, Plaintiffs have not shown that given IEP's financial disclosures, investors did not have enough information to evaluate the risks associated with the dividend policy. *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1183 (S.D. Fla. 2015), *aff'd sub nom. IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850 (11th Cir. 2016) (explaining that the "motivation of management is not a material 'fact' subject to disclosure").

Plaintiffs also allege that IEP sold depositary units to new investors via ATM offerings to fund dividend payments for existing investors, in an effort "to maintain the illusion of adequate cash." Consol. Compl. ¶¶ 304–305. Defendants argue that (1) IEP's Form 10-Ks and 10-Qs regularly disclosed throughout the Class Period that IEP always held more cash than was needed

to fund dividends; (2) Plaintiffs allege no facts to support the assertion that IEP needed to sell units to fund dividend payments; and (3) any statements that IEP made regarding the future use of offering proceeds were forward-looking statements protected under the PSLRA safe harbor.  Mot. at 23–24.  In response, Plaintiffs argue that issuing ATM offerings and securing more than $1.7 billion to fund the cash dividend distributions was effectively a "pump and dump" operation, just one part of the larger deceptive conduct in Defendants' Dividend Inducement Scheme.  *See* Resp. at 11–12 (arguing that IEP was "'pumping' the unit prices and 'dumping' inflated units on investors"); Consol. Compl. ¶ 400.  Because IEP's financial performance alone could not support the dividends, Plaintiffs allege that the use of ATM offerings to fund dividends, rather than operations, was material information that investors were entitled to know, yet Defendants concealed this fact.

The Court finds that Plaintiffs have not adequately alleged a material omission regarding IEP's use of ATM proceeds to fund dividend payments.  As an initial matter, the Court is not convinced by Plaintiffs' "pump and dump" analogy because here, there was no "dump"—Plaintiffs do not allege that any Defendants sold their shares after artificially inflating the stock price through false and misleading statements.  *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1265, 1274 n.7 (11th Cir. 2016) (describing case as "at most, a 'pump' without a 'dump'" where individuals did not sell their shares); Reply at 17.  Further, Defendants attach multiple disclosures showing that IEP warned that the proceeds could be used for general corporate purposes, including dividends.  *See, e.g.*, (ECF No. 97-13 at S-5) (Aug. 6, 2021 Prospectus Supplement stating that "Management will have broad discretion as to the use of the proceeds from this offering . . . .  The results and effectiveness of the use of proceeds are uncertain, and we could spend the proceeds in

ways that you do not agree with or that do not . . . enhance the value of our depositary units.").[5]
Here, investors were made aware of IEP's reliance on capital markets to raise funds and the
specific use of ATM proceeds to fund dividend payments does not constitute a material omission.
The Court agrees with Defendants that Plaintiffs put forth insufficient facts to support the idea that
IEP needed to sell units to generate the proceeds used for dividend payments.  *See* Mot. at 24
("Plaintiffs do not plead facts showing, among other things, that: (1) without the offerings, IEP did
not have sufficient cash to pay distributions; (2) anyone at IEP believed that the purpose of the
offerings was to pay distributions; or (3) any of IEP's statements regarding its offerings was false
or that any Defendant knew the statements were false.").  Thus, Plaintiffs' reliance on this alleged
omission is not enough to support a material misstatement or omission claim under the heightened
pleading standard of the PSLRA.

Next, the Consolidated Complaint alleges that prior to reporting IEP's first quarter 2023
results, qualitative factors (e.g., supply chain disruptions, the effects of the COVID-19 pandemic,
and inflation) required IEP to perform an impairment analysis of the Automotive Group Division,
but IEP failed to timely perform and take an impairment charge—this delay deceived the market
until a $226 million charge was later revealed in IEP's first quarter 2023 results.  Consol. Compl.
¶ 294.  Plaintiffs further allege that Defendants Cozza, Kekedjian, Willetts, Cho, and Papapostolou

---

[5] Courts may consider exhibits attached to a motion to dismiss without converting the motion into
one for summary judgment if the exhibits are (1) central to the plaintiff's claim and (2) their
authenticity is not disputed.  *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945
F.3d 1150, 1162 (11th Cir. 2019).  In addition, the PSLRA "contains a provision that directs the
district court to consider not only 'any statement cited in the complaint' but also 'any cautionary
statement accompanying the forward-looking statement, which are [sic] not subject to material
dispute, cited by the defendant.'"  *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999)
(quoting PSLRA § 102(b), codified in 15 U.S.C. § 78u-5(e)).  Importantly, Plaintiffs here do not
contest the authenticity of this exhibit.

materially misrepresented IEP's internal controls over financial reporting ("ICFR") by recklessly signing Sarbanes-Oxley (SOX) certifications throughout the Class Period, leading to financial misstatements with respect to the Automotive Group Division. *Id.* ¶ 361–363. Defendants argue that Plaintiffs' claims based on the Automotive Group Division's impairment charge do not establish any material misstatement or omission because (1) Auto Parts Plus had already written down its goodwill by early 2019; (2) Plaintiffs fail to plead particularized facts showing that Defendants knew that impairments were needed earlier; (3) Plaintiffs fail to demonstrate the falsity of Defendants' goodwill and impairment opinions; and (4) Plaintiffs plead insufficient facts to support purported internal control deficiencies. Mot. at 28–35. In response, Plaintiffs argue that they have adequately pleaded that IEP's failure to timely recognize the impairment charge violated GAAP and misled investors by inflating the value of its Automotive Group Division. Resp. at 28–29. This delay in recognizing the impairment was significant because it allowed IEP to present a more favorable financial picture in support of its unsustainable dividend payments.

At the outset, the Court agrees with Defendants that Plaintiffs appear to have conceded that IEP had already written down all the Auto Parts Plus reporting unit's goodwill by early 2019. *See* Mot. at 28–29; Reply at 13 (noting that Plaintiffs failed to respond to the goodwill argument and the word "goodwill" does not appear anywhere in Plaintiffs' Response). Further, the Court is not convinced that Plaintiffs have pleaded sufficient facts to show that Defendants knew impairments were needed earlier. For example, the Consolidated Complaint states, "Plaintiffs are informed and believe and therefore allege that IEP would have been required to take an inventory write down and large charge on its balance sheet when reporting its financial results for the fourth quarter and fiscal year 2022, which it thereby delayed by at least a full quarter . . . ." Consol. Compl. ¶ 237. Plaintiffs' allegations regarding impairment mostly relate to IEP's failure to recognize the

impairment in the fourth quarter of 2022 versus the first quarter of 2023.  In the Eleventh Circuit, however, "allegations of violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208–09 (11th Cir. 2001); *see also In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1279 (S.D. Fla. 2017) (dismissing securities claim because the amended complaint did not allege the existence of any statement that, if true, suggested defendants knew an impairment charge was necessary in the first quarter rather than the third quarter of 2015).

Defendants further argue that the impairment charge was ultimately disclosed, and Plaintiffs have not alleged that IEP's financial statements were ever restated or that its auditors raised concerns about the impairment charge, undermining any claim that IEP's financial reporting violated GAAP or was otherwise misleading.  *See* Mot. at 33.  Plaintiffs have not persuaded the Court that the delayed recognition of the impairment materially impacted IEP's financial condition in a way that misled investors, especially when IEP did disclose challenges with the Automotive Segment prior to 2023.  *See, e.g.,* Consol. Compl. ¶ 205 (IEP reported losses of $205 million attributable to "Automotive transformation losses and an inventory write down" during the Fourth Quarter 2021 Conference Call).  Without more specific allegations linking the impairment to a material misstatement or demonstrating that the delay significantly altered investors' understanding of IEP's financial health, Plaintiffs' claims cannot survive the heightened pleading standard required for securities fraud cases.

3.    Statements Concerning Defendants' Use of Indicative NAV

Parallel to their claims regarding dividend sustainability, Plaintiffs allege that IEP's references to indicative NAV[6] as a key metric to assess the company's value was materially false and misleading.  *See* Consol. Compl. ¶ 302 (alleging that "IEP manipulated certain valuation metrics to present an inflated indicative NAV to investors" to "maintain the illusion" that IEP "had adequate liquidity to fund the dividends").  Defendants argue that (1) Plaintiffs fail to plead with particularity that IEP's reported indicative NAVs were misleading or false; (2) non-GAAP measures such as indicative NAV are not actionable; and (3) indicative NAV is a nonactionable statement of opinion.  Mot. at 24–28.  In response, Plaintiffs argue that the statements regarding IEP's indicative NAV were materially misleading because Defendants used indicative NAV to manipulate asset valuations and convince investors that IEP could sustain its dividend payments on ordinary operations.  Resp. at 14.  Plaintiffs add that the challenged statements are not protected opinions because they were representations of financial condition and "recite raw facts, not opinions."  *Id.* at 20.

The Court finds that the indicative NAV estimates were qualified by cautionary language in IEP's public filings, warning investors that indicative NAV was based on assumptions and subject to change based on market conditions.  For example, the Consolidated Complaint references IEP's Fourth Quarter 2022 Earnings Presentation held on February 24, 2023.  Consol. Compl. ¶ 248.  Plaintiffs explain that the presentation used "slides that highlighted, among other financial results, the increased Net Asset Value as of December 31, 2022, increased the full year

_____

[6] For background, indicative NAV is a company-specific calculation of its asset value, often used to provide an estimated valuation of a company's assets based on current market conditions.  In contrast, GAAP NAV (General Accepted Accounting Principles NAV) adheres to strict accounting rules, which require the valuation of assets to be based on recognized accounting standards.  GAAP NAV prioritizes consistency and regulatory compliance, whereas indicative NAV depends upon the chosen valuation methodology one applies, as well as the built-in assumptions regarding the inputs to the valuation calculations.

Adjusted EBITDA of $778 million versus $273 million for 2023, and importantly, the Board's declaration of a dividend of $2.00 per depositary unit for the quarter." *Id.* Defendants attach that same presentation to their Motion, highlighting the following slide:

> A valuation is a subjective exercise and indicative net asset value does not necessarily consider all elements or consider in the adequate proportion the elements that could affect the valuation of IEP. Investors may reasonably differ on what such elements are and their impact on IEP. No representation or assurance, express or implied, is made as to the accuracy and correctness of indicative net asset value as of these dates or with respect to any future indicative or prospective results which may vary.

(ECF No. 97-4) at 13; *see also* Mot. at 4. In addition, the Consolidated Complaint references a press release issued by IEP on February 24, 2023, titled "Icahn Enterprises L.P. Reports Fourth Quarter 2022 Financial Results." Consol. Compl. ¶ 238. Plaintiffs emphasize that the press release "highlighted in bold bullet-points both increased Net Asset Value and the Icahn controlled Board's declaration of a $2 per unit quarterly dividend distribution." *Id.* ¶ 239. In their Motion, Defendants attach that same press release, highlighting that the press release also includes the following:

> The Company uses indicative net asset value as an additional method for considering the value of the Company's assets, and we believe that this information can be helpful to investors. Please note, however, that the indicative net asset value does not represent the market price at which the depositary units trade. Accordingly, data regarding indicative net asset value is of limited use and should not be considered in isolation.

(ECF No. 97-4) at 4; *see also* Mot. at 4–5. Plaintiffs may be correct that there were better ways for IEP to calculate its NAV than using indicative NAV methodologies; perhaps GAAP NAV would have more accurately reflected the company's financial health. But federal securities laws "do not protect the marketplace from flawed business decisions, which is what choosing to calculate a metric in a particular way is where, as here, there is no settled formula." *Ironworkers Loc. 580--Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 428 (S.D.N.Y. 2014). Because IEP's public filings contained extensive cautionary language regarding the assumptions underlying

its indicative NAV calculations, the Court does not find that, as pled, the statements related to indicative NAV are materially false or misleading.  As such, the Court need not reach Defendants' other argument that indicative NAV statements are nonactionable opinions.

4.    <u>Statements Relating to Carl Icahn's Personal Financial Interests</u>

Plaintiffs assert that Defendants failed to disclose Carl Icahn's personal financial interest in maintaining the dividends to avoid a massive margin call on his personal loans.  *See* Consol. Compl. ¶ 92 (alleging that IEP's disclosures concealed from the market "that the loan-to-value ratios in Mr. Icahn's debt covenants tethered to IEP's unit trading price created a significant and material undisclosed risk of a margin call on Mr. Icahn's personal loans").  Defendants argue that Icahn's personal loans were fully disclosed in IEP's public filings, including the number of units pledged as collateral and the fact that the covenants underlying Icahn's loans turned on the stock price.  Mot. at 16.  Additionally, IEP had no duty to disclose the specific LTV ratios, nor is that information material.  *Id.* at 16–17 (explaining that Item 403(b) in 17 C.F.R. § 229.403(b) only requires issuers to "indicate, by footnote or otherwise, the amount of shares that are pledged as security" by members of management).  In response, Plaintiffs argue that by concealing the nature of the LTV ratios and the material risk that LTV de-linkage posed to dividend payments, Defendants "fail[ed] to speak the whole truth" and their omissions are actionable in light of other disclosures by IEP.  *See* Resp. at 18 (citing *FindWhat*, 658 F.3d at 1305 (explaining that "a defendant may not deal in half-truths")).

The key issue is whether the specific terms of Mr. Icahn's personal loans, beyond the general disclosure of the number of pledged units and the stock price linkage, were material to investors' decision-making.  The Court is persuaded by Defendants' argument that there is no obligation to disclose the specific terms of an executive's personal financial arrangements, such as

21

loan covenants, unless those terms would materially affect the company's financial disclosures or operations. Here, while Icahn's personal loans were undoubtedly tied to the value of IEP's stock, the general disclosure of this fact was sufficient to alert investors to the relevant risks. *See United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1242 (10th Cir. 2014), as amended *nunc pro tunc* (Nov. 12, 2014) (rejecting plaintiff's argument that further disclosure was required beyond a CEO's compliance with Item 403(b) because the "risk of margin calls and the consequent need of the owner of the stock to sell shares is obvious"); *Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 611 (5th Cir. 1979)[7] (explaining that an allegation would not "state a claim for which relief might be granted if it contended only that the defendants failed to reveal the obvious or the well-known"). Indeed, the risks associated with margin loans and a corporate executive's desire to avoid a margin call are generally understood by investors. Here, the connection between Icahn's personal loans and IEP's stock price was sufficiently disclosed and Plaintiffs have not alleged specific facts, nor have they cited to any persuasive authority, to support that Defendants "were required to close that Icahn's margin loan LTV ratios were linked to unit price." Resp. at 42. Plaintiffs also fail to allege that the specific terms of Icahn's loans differed in any material way from the general disclosures already made. Without a clear showing that the specific loan terms were materially different from what was disclosed, the Court does not see how that additional information would significantly alter the total mix of information available to the reasonable investor. *See Carvelli*, 934 F.3d at 1317.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Accordingly, the Court does not find that, as pled, the statements related to Icahn's margin loans are materially false or misleading, particularly considering that IEP's Form 10-Ks disclosed that the "number of depositary units pledged to secure these loans fluctuates" was based upon, among other things, "the market price of the depositary units." *See* Mot. at 18.

### B.      Scienter

"Under the PSLRA, a plaintiff cannot 'plead the requisite scienter element generally . . . .'" *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) (quoting *Mizzaro*, 544 F.3d at 1238).  In the Eleventh Circuit, "§ 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Id.* (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010)) (internal citation and quotation marks omitted).  The PSLRA "requires, 'with respect to each act or omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Carvelli*, 934 F.3d at 1318 (quoting § 78u-4(b)(2)(A)).  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24.  "A complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

As set forth above, the Court has not found Defendants' statements to be materially false or misleading to sustain a securities fraud claim.  Even if the statements were materially false or misleading, the Court finds that Plaintiffs have not sufficiently alleged a strong inference that

Defendants acted with (1) the intent to deceive, manipulate, or defraud its investors; or (2) severe recklessness.

Defendants argue that Plaintiffs improperly rely on group pleading, using broad allegations to lump all "Defendants" or "management" together, to avoid pleading scienter as to each Individual Defendant. Mot. at 37. As the Eleventh Circuit has explained, the "complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238. Thus, the group pleading doctrine does not apply to the PSLRA's scienter requirements. *See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015) (concluding that the complaint "improperly group[ed] the Defendants . . . instead of clearly distinguishing how each defendant acted purposefully or with severe recklessness"). Here, most of the allegations concerning scienter, especially the "Additional Allegations Supporting Defendants' Scienter" section, refer to all Individual Defendants together. *See* Consol. Compl. ¶¶ 383–415. Because Plaintiffs fail to clearly distinguish how each Individual Defendant acted purposefully or with severe recklessness, the Court cannot meaningfully assess whether any of the Individual Defendants acted with scienter, except for perhaps Carl Icahn.

Plaintiffs' strongest argument for scienter is with regards to Carl Icahn, as there are many allegations singling out Icahn from the rest of the Individual Defendants. Plaintiffs assert that when viewed holistically, the Consolidated Complaint sufficiently alleges that Carl Icahn, as IEP's controlling shareholder, orchestrated the Dividend Inducement Scheme and knew that trading prices would fall without the artificially inflated dividends. Resp. at 34–35; *see also* Consol. Compl. ¶¶ 390–393. Icahn had "unfettered access to information" as well as the "motive to deceive investors in order to shelter himself from a margin call on his $3.7 billion margin loan." Resp. at

36.  After the Hindenburg Report was published, Icahn "led a fight against Hindenburg, falsely denying the Report's accuracy and . . . furthering the Dividend Inducement Scheme by announcing yet another $2 per unit quarter dividend . . . ." *Id.* at 37.  While Icahn's personal financial interests are certainly relevant in assessing scienter, the Court finds that the public disclosures regarding his margin loans significantly cut against the inference of fraudulent intent.  Indeed, IEP's filings disclosed the number of units pledged and the fact that the stock price would impact the margin loan, which also should have been apparent to the reasonable investor.  Without more, Plaintiffs' allegations regarding Icahn's personal motives do not give rise to a strong inference of scienter.

Plaintiffs also rely on the "core operations" doctrine, arguing that "valuing companies, including their assets and profitability and prospects for growth, was a matter of expertise with respect to Icahn" and thus a "core business operation of IEP."  Consol. Compl. ¶ 388.  Plaintiffs encourage the Court to infer that based on their expertise, Defendants knew the truth that IEP's total asset values were overvalued and misleading to investors.  *Id.* ¶ 389.  Defendants argue that at most, the core operations doctrine might support that the Individual Defendants knew that IEP used indicative NAV, not that Defendants knew that the indicative NAV calculations were false.  Mot. at 39.   In response, Plaintiffs emphasize that an inference of scienter is "bolstered by allegations indicating that the subject of the alleged fraud was a core operation of the company."  Resp. at 31 (citing *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018)).  While the Court agrees that the core operations doctrine is meant to bolster an inference of scienter, it is not meant to excuse Plaintiffs from offering specific facts.  *See Thorpe*, 111 F. Supp. 3d at 1376 ("[T]he Court finds that merely alleging that [it] is a core operation does not lead to a conclusion that [defendants] acted with scienter because the PLSRA requires more.")

Because scienter analysis is comparative, the Court notes the alternative inferences arising from the Consolidated Complaint.  *See FindWhat*, 658 F.3d at 1303.  For example, Defendants emphasize that IEP disclosed in its 2021 Form 10-K that Icahn pledged shares as security for his margin loans—this supports the inference that it was not his intention to hide the possibility of a margin call and any risk thereof was well known to investors.  *See* Mot. at 40.  Another fact weighing against a finding of scienter is the lack of insider trading during the Class Period— Plaintiffs do not allege that Carl Icahn or any other Individual Defendant sold IEP stock at inflated prices during the Class Period.  *See* Mot. at 41.  This conduct suggests that the Individual Defendants, including Icahn, believed in the long-term value of IEP and is inconsistent with the theory that Defendants were engaged in a scheme to artificially inflate the stock price for personal gain.  On balance, the Court does not find the inference of scienter to be as compelling as the opposing inferences that one could draw from the facts alleged here.  *See Tellabs*, 551 U.S. at 324.

Since Icahn Enterprises has no mind of its own and the Complaint fails to plead scienter as to the Individual Defendants, it fails to plead scienter as to Icahn Enterprises as well.  *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them.").

Accordingly, the Court finds that Plaintiffs have failed to meet the heightened pleading standard for both material misstatements or omissions and scienter.  Without sufficiently alleging these elements, the Court need not reach the remaining aspects of the securities fraud claim.  The request for a hearing is denied.

## C.    Motion to Strike Reply

Finally, the Court turns briefly to Lead Plaintiff's Motion to Strike and Objection to Defendants' Reply.  (ECF No. 105).  Therein, Lead Plaintiff moves to strike the following

statements from the Reply: (1) statements regarding a new argument raising a procedural basis for dismissal that Defendants did not raise in their Motion to Dismiss; and (2) statements raising contestable issues of fact not appropriate for judicial notice, consideration, or determination at this stage of the proceedings. *See generally id.* The Motion to Strike is fully briefed. (ECF Nos. 111, 112).

First, Lead Plaintiff objects to a new argument raised by Defendants in Section II.A of their Reply, in which Defendants argue that Plaintiffs' scheme liability claim violates pleading rules by incorporating all proceeding paragraphs into its claim for scheme liability.  In response, Defendants argue that their argument about the pleading deficiency is in direct response to Plaintiffs' argument in their Response that they alleged deceptive conduct to support their scheme liability claim. (ECF No. 106) at 3.  Because the Court has not relied on this argument to adjudicate the Motion to Dismiss, the request to strike Section II.A of the Reply is moot.

Next, Lead Plaintiff objects to exhibits attached to the Motion to Dismiss and note that Defendants have not requested that the Court take judicial notice of any of the exhibits cited in their Motion to Dismiss or Reply for the truth of the matters stated in those documents.  (ECF No. 105) at 4.  Lead Plaintiff objects to documents used to support the arguments that (1) Carl Icahn chose to lower the quarterly dividend paid to IEP shareholders to $1.00 to maintain IEP's historical distribution yield of about 14%; and (2) it was almost impossible for Icahn to lose control of Icahn Enterprises. *Id.* at 5–7.  For example, Lead Plaintiff objects to the August 4, 2023 Press Release because Defendants use it to directly contradict the Consolidated Complaint, which alleges that Icahn abandoned the Dividend Inducement Scheme only after de-linking IEP's unit trading price from his margin loans. *Id.* at 5.  Lead Plaintiff also objects to Defendant's use of the Partnership Agreement attached to their Motion to Dismiss because the Partnership Agreement was neither

alleged nor relied upon in the Consolidated Complaint, nor is it a document executed by Plaintiffs. *Id.* at 6. Based on the purported improperly used documents, Lead Plaintiff lists the specific sections of the Reply that he requests to be stricken. *See* (ECF No. 105-1) at 1–2.

In response, Defendants aver that their arguments about distribution yield and the likelihood of Icahn losing control of IEP are properly presented. *See* (ECF No. 106) at 5–13. However, because the Court has not relied on the portions of the Reply that Lead Plaintiff moves to strike or the specific documents disputed in the Motion to Strike, *see supra* Sections III.A–B, the Court need not determine whether Defendants' arguments are properly raised in their Reply. As such, the Motion to Strike is denied as moot.

## IV.   CONCLUSION

Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 97) is GRANTED and the Consolidated Class Action Complaint (ECF No. 85) is DISMISSED WITHOUT PREJUDICE. It is FURTHER ORDERED that Lead Plaintiff's Motion to Strike and Objection to Defendants' Reply (ECF No. 105) is DENIED AS MOOT. The Clerk of Court is INSTRUCTED to administratively CLOSE THIS CASE. Should Lead Plaintiff choose to file an amended complaint, he may do so on or before October 14, 2024.

DONE AND ORDERED in Chambers at Miami, Florida, this 13th day of September, 2024.

*K. M. Moore*

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record